**In the Interest of S.G.S., S.A.S., and S.L.L., Minor Children.**

**No. 09–02–062 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Sept. 11, 2003.

Decided Jan. 22, 2004.

Troy D. Soileau, Law Office of Troy D. Soileau, Lumberton, Richard Dutton, Kountze, for appellants.

John M. Gascoigne, Regional Atty.-TDPRS, Beaumont, David Sheffield County Atty., Kountze, for appellee.

Before STEVE McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

**OPINION**

STEVE McKEITHEN, Chief Justice.

This is a parental rights termination case. The Texas Department of Protective and Regulatory Services ("The Department") alleged three grounds for termination: (1) endangerment by conditions or surroundings; (2) conduct endangerment; and (3) failure to comply with a court order. *See* TEX. FAM.CODE ANN. § 161.001(D)(E)(O) (Vernon 2002). As to both parents, the jury found at least one ground supported termination, and that termination was in the best interest of each of the three children. The trial court rendered judgment on the verdict. The parents, Penny Ann Luckey and Shawn A. Luckey, raise the same issues in their separate briefs.

■ Issue One contends "The failure of the Attorney Ad Litem to perform statutorily mandated duties violates [Penny Luckey's and Shawn Luckey's] Due Process and Equal Protection rights afforded by the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Sec. 9 and 10 of the Texas Constitution." The Luckeys contend that the children's attorney ad litem provided ineffective assistance of counsel. The Luckeys argue that the attorney appointed by the trial court to represent the children should be held to the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that counsel appointed in this case failed to satisfy her duties and obligations by meeting with the Luckeys. For the moment, we will set aside the issue of whether the performance of the children's representative affects the parents' rights to due process and equal protection, and focus upon the factual basis for the complaint raised on appeal.

The parties agree that the attorney ad litem's duties are set forth in Section 107.014, Texas Family Code. Those duties include investigating "to the extent the attorney ad litem considers appropriate to determine the facts of the case." *See* TEX. FAM.CODE ANN. § 107.014(a)(1) (Vernon 2002). "An attorney ad litem appointed to represent a child shall within a reasonable time after the appointment ... interview all parties to the suit." TEX. FAM.CODE ANN. § 107.014(b)(3) (Vernon 2002). The Luckeys claim that the attorney failed to satisfy her duty to investigate because she never met with them. Counsel's effectiveness was not formally challenged in the trial court, either during the trial or in a motion for new trial hearing. Her investigation of the case is not described in the record. In support of their factual assertion that the children's attorney failed to interview them, the Luckeys rely upon the

following testimony given by Penny during cross-examination by Shawn's attorney:

Q. [By Counsel] All right. Did [Penny's attorney] ever tell you that it's a matter of law that someone appointed as an attorney representing your children, an attorney ad litem must interview you within a reasonable amount of time. Did he ever tell you that?

A. [By the Witness] Yes, sir.

Q. Okay. Did [the attorney ad litem] ever go and interview you? Now, [the attorney ad litem]'s the one—blond-haired lady. Did she ever sit down and interview you?

A. (No response)

Q. You know what an interview is?

A. Yes, sir. I don't remember.

Q. Okay. Do you ever remember your husband having an appointment with [the attorney ad litem] so she could interview him?

A. No, I don't. No.

To the extent that this testimony can be said to prove the Luckeys' claim that the attorney ad litem never met with them, it is controverted by the following testimony by Shawn during his cross-examination by the attorney ad litem:

Q. [By Counsel] Do you remember seeing me and [the guardian ad litem for the children] and [Penny's attorney] and your wife and [Shawn's attorney] across the highway here in that building during the permanency planning meetings?

A. [By the Witness] Do I remember?

Q. Uh-huh. You remember seeing us all present?

A. What do you mean across the highway?

Q. Where the CPS is. The CPS building where we would all meet together.

A. Yes, I remember having a meeting over there with all y'all in it.

Q. Do you remember that?

A. Yeah, I think. Not the first one, but maybe the second or third. I'm not for sure.

Q. And you have met [the guardian ad litem for the children] and I[sic] prior to this hearing?

A. Yeah. At that first meeting, I think.

Q. And do you realize that we're not allowed to talk to you without your attorneys?

A. I don't guess. No. I don't . . .

Q. In those meetings you don't recall our long discussions with [Shawn's and Penny's attorneys] concerning the health and welfare of your children?

A. Y'all mentioned some small basic—yeah, but it was what was wrong basically. That's all I remember is what y'all's mention was everything that—why y'all took them away.

Q. Well, we've had four meetings where all of us were usually present. And in those meetings do you remember your attorney being there?

A. Yeah.

The person raising the claim of ineffective assistance has the burden of establishing both deficient performance and sufficient prejudice to the defense. *In the Interest of M.S.*, 115 S.W.3d 534, 544–45 (Tex.2003).

With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a "reasonably effective" manner. The Court of Criminal Appeals explained that counsel's performance falls below acceptable levels of performance when the "representation is

so grossly deficient as to render proceedings fundamentally unfair...." [1] In this process, we must give great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," including the possibility that counsel's actions are strategic. It is only when "the conduct was so outrageous that no competent attorney would have engaged in it," that the challenged conduct will constitute ineffective assistance.[2] (footnotes in original text omitted).

*Id.* at 545 (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Garcia v. State,* 57 S.W.3d 436, 440–41 (Tex.Crim.App.2001); *Thompson v. State,* 9 S.W.3d 808, 812–13 (Tex.Crim.App.1999); *Brewer v. State,* 649 S.W.2d 628, 630 (Tex.Crim.App.1983); *Gamble v. State,* 916 S.W.2d 92, 93 (Tex. App.-Houston [1st Dist.] 1996, no pet.)). The appellants have not established that the children's attorney ad litem failed to perform the actions required by Family Code Section 107.104. The record does not reveal deficient performance by the attorney sufficient to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Issue One is overruled.

■ Both Shawn's and Penny's second issues contend the trial court abused its discretion by refusing to allow the appellant to file amended pleadings to allege the Department's failure to comply with the Americans with Disabilities Act ("the ADA") as an affirmative defense to termination of Shawn's and Penny's parental rights. With an I.Q. of 62, Penny is mildly mentally retarded. The issue of the Department's ADA compliance efforts arose during cross-examination of Bernadette Cascio, the Department employee who provided parenting classes in 2001. Shawn attended only the first four and Penny the first five of eight parenting classes. Penny asked if she could make up one of the classes. Cascio agreed and gave Penny directions to the location of the alternate class, but Penny did not attend it. During Cascio's cross-examination, Shawn's counsel implied that Penny did not have a driver's license due to her disability and suggested that a reasonable accommodation for a mildly mentally retarded person might include providing transportation to and from parenting class.

Penny moved to orally amend her pleadings "to include an affirmative defense of the failure to comply with the American with Disabilities Act." Shawn Luckey did not move to amend his pleadings and made it clear to the trial court that he did not contend that the Department's case should be "thrown out" for failure to comply with the ADA. He did assert that he should be permitted to cross-examine the Department's witnesses about the ADA and how the Department applies it to this particular client. Over the Department's objection, the appellants were able to develop testimony regarding the ADA and its application in parental rights cases. Cascio agreed that special accommodations for a mildly retarded person might include one-on-one instruction and reinforcement

---

**1.** The Supreme Court cites *Brewer v. State,* 649 S.W.2d 628, 630 (Tex.Crim.App.1983), a pre-*Strickland* joint representation case, as the source for this rule. Post-*Strickland,* the Court of Criminal Appeals has consistently expressed as deficient a performance that "[falls] below an objective standard of reasonableness under prevailing professional norms." *See, e.g., Rosales v. State,* 4 S.W.3d 228, 231 (Tex.Crim.App.1999).

**2.** In criminal cases, this last stated rule applies to cases where the record is silent regarding counsel's reasons for the challenged conduct. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001).

through repetition. Specific accommodations implemented for Penny Luckey included providing a meeting room without distractions and having either her husband or a staff member sit with Penny during written or reading exercises. Cascio testified that providing transportation to parenting classes exceeded reasonable accommodations, but caseworkers do on occasion provide transportation and such services might be arranged for a mentally impaired person through caseworkers for the Department of Mental Health and Mental Retardation. Transportation services were not provided to Penny because Penny and Shawn came to the classes together and no one requested transportation services as an accommodation for Penny's disability. The Luckeys did not bring any need for additional accommodation to Cascio's attention. They never verbalized that the classes were causing a hardship, and stopped attending the classes halfway through the course.

■■■■ On appeal, the Luckeys argue that they were each entitled to amend their pleadings under Tex.R. Civ. P. 66 and that the ruling prevented each of them from presenting the merits of their case.

If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court *may* allow the pleadings to be amended and *shall* do so freely when the presentation of the merits will be subserved thereby and the objecting party fails to satisfy the court that the amendment would prejudice that party in maintaining the action or defense on the merits. Tex.R. Civ. P. 66 (emphasis supplied). A court may not refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face. *Greenhalgh v. Service*

*Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990). The burden of showing surprise or prejudice rests on the party resisting the amendment. *Id.* If the trial amendment is not mandatory, then the decision to permit or deny the amendment rests within the sound discretion of the trial court. Tex.R. Civ. P. 66; *Greenhalgh,* 787 S.W.2d at 939. In such a case, the court's decision to allow or deny a trial amendment may be reversed only if it is a clear abuse of discretion. *Hardin v. Hardin,* 597 S.W.2d 347, 349–50 (Tex.1980). *State Bar of Texas v. Kilpatrick,* 874 S.W.2d 656, 658 (Tex.1994).

As the Department objected to the amendment, and the evidence admitted prior to the motion related to the pleaded issue of the best interests of the children, the issue of ADA compliance as an affirmative defense was not tried by consent. *See Sun Power, Inc. v. Adams,* 751 S.W.2d 689, 696 (Tex.App.-Fort Worth 1988, no writ). On appeal, the Luckeys argue that the trial court's refusal to permit a trial amendment prevented each of them "from presenting the merits of her case." However, they developed evidence regarding ADA compliance and argued it to the jury. The trial court's ruling only prevented them from asserting the issue as a bar to termination. Neither Shawn nor Penny presented any argument or authority that failure to comply with the ADA is an affirmative defense to an action to terminate parental rights.

The Department cites decisions from other states rejecting the proposition that an ADA violation is a defense in termination proceedings. *See In re La'Asia S.,* 191 Misc.2d 28, 739 N.Y.S.2d 898, 908–09 (N.Y.Fam.Ct.2002); *People ex. rel. T.B.,* 12 P.3d 1221 (Colo.Ct.App.2000)(citing, among others, *J.T. v. Arkansas Dep't of Human Servs.,* 329 Ark. 243, 947 S.W.2d 761 (Ark.

1997); *Stone v. Daviess County Div. of Children & Family Servs.*, 656 N.E.2d 824 (Ind.App.1995); *In re Terry*, 240 Mich. App. 14, 610 N.W.2d 563 (Mich.App.2000); *In re A.P.*, 1999 PA Super 78, 728 A.2d 375 (Pa.Super.1999); *In re B.S.*, 166 Vt. 345, 693 A.2d 716 (Vt.1997); and *In re Torrance*, 187 Wis.2d 10, 522 N.W.2d 243 (Wis.App.1994)); *In re Antony B.*, 54 Conn.App. 463, 735 A.2d 893 (Conn.App. 1999); *State ex rel. B.K.F.*, 704 So.2d 314 (La.App. 5th Cir.1997, writ denied). The Supreme Court of Hawaii recently held that allegations of an ADA violation are not a defense to termination proceedings because any purported violation may be remedied only in a separate proceeding brought under the provisions of the ADA. *In the Interest of Doe*, 100 Hawai'i 335, 60 P.3d 285, 291 (Haw.2002). The *Doe* court noted that the Department is under an obligation to provide a reasonable opportunity to parents through a service plan to reunite the family. *Id.* at 293. There, the mother was represented by counsel, but never contested the service plan or requested additional services or accommodations until the start of the trial. *Id.* at 294. "To allow the provisions of the ADA to constitute a defense to termination proceedings would improperly elevate the rights of the parent above those of the child." *People ex. rel. T.B.*, 12 P.3d at 1224. In light of the contrary authority from other states, we decline to create an affirmative defense out of noncompliance with the ADA.

The issue before us is not whether the Department complied with the ADA in this case, but whether the trial court erred in refusing to allow the Appellants to amend their pleadings to allege ADA noncompliance as an affirmative defense. The Department and children's ad litem complained that they were not prepared to address a noncompliance claim raised for the first time in the midst of trial, and complained that permitting the appellants to do so would improperly shift the focus of the suit from what the Luckeys did or did not do for the children to what the Department did or did not do for one of the parents. Therefore, the decision to deny leave to file a trial amendment was within the trial court's discretion. Because the Luckeys were able to develop a record on ADA compliance efforts, and were able to argue the issue during their closing arguments on the jury charge, a trial amendment was unnecessary. Issue Two is overruled.

Shawn's and Penny's third issue challenges the legal and the factual sufficiency of the evidence that it was in the children's best interest to terminate parental rights and the finding of a statutory factor under Texas Family Code § 161.001(1)(D), (E), or (O) that the parental relationship between the parent and each child should be terminated. The appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex.2002).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-

finder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). If we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, we must conclude that the evidence is legally insufficient and render judgment for the parent. *Id.*

█ The sufficiency of the evidence to support a positive finding on these predicate statutory factors was challenged in an oral motion for directed verdict. Except for a complaint that the Department failed to make reasonable efforts to reunify the family and failed to comply with the ADA, however, the best interest issue was not raised in the motion for directed verdict or in the charge conference. Furthermore, the appellants concede that the factual sufficiency issue was not preserved for appellate review but is raised for the first time on appeal. The Luckeys argue that the criminal rule for preservation of sufficien-

cy issues should apply to parental termination cases. We rejected that argument in *M.S.;* the Supreme Court considered the appellant's complaint regarding our ruling only in conjunction with the issue related to ineffective assistance of counsel. *M.S.*, 115 S.W.3d at 536, 544.[3] The Luckeys do not raise an issue of ineffective assistance of counsel as an issue on appeal.

█ The scope of appellate review is limited by well-established rules regarding preservation and assignment of error. *See* Tex.R.App. P. 33.1; *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998). Therefore, we must decide whether applying those rules will deprive the appellants of procedural due process. The Supreme Court has held that, as a general rule, due process does not mandate that appellate courts review unpreserved complaints of charge error in parental rights termination cases. *In the Interest of B.L.D.*, 113 S.W.3d 340, 354 (Tex.2003).[4] On the same day, the Supreme Court recognized in *M.S.* that counsel's unjustifiable failure to preserve a factual sufficiency point for appellate review could amount to a due process violation. *M.S.*, 115 S.W.3d at 549. This case exists somewhere between these two precedents.[5] Relying on *Mathews v.*

---

3. In our state jurisprudence, legal and factual sufficiency in criminal cases has been held to be an absolute requirement not subject to procedural default. *Givens v. State*, 26 S.W.3d 739, 740–41 (Tex.App.-Austin 2000, pet. ref'd). The sufficiency exception to the general error preservation rule in criminal cases is certainly well entrenched, but our state precedent is not necessarily compelled by federal constitutional due process. For instance, the Fifth Circuit has repeatedly held that when a challenge to the sufficiency of the evidence is not presented at the trial level, the appellate court's review will be limited to determining whether the record is so devoid of evidence pointing to guilt that a manifest miscarriage of justice will result. *See, e.g., United States v. Galvan*, 949 F.2d 777, 782–83 (5th Cir.1991).

4. In our criminal jurisprudence, fundamental error in the jury charge is not subject to procedural default but is reviewed for "egregious harm" under a standard similar to federal "plain error." *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (opin. on reh'g).

5. *M.S.* states, "That a motion for new trial is required for appellate review of a factual sufficiency issue is something that competent trial counsel in Texas should know." *Id.* at 549. Considering this statement, it would be quite ironic for us to hold the issue to be exempt from procedural default.

*Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), in *M.S.* the Supreme Court considered three factors: (1) the private interests at stake; (2) the government's interest in the proceeding; and (3) the risk of erroneous deprivation of parental rights. *Id.* at 547–49. The net result of those three factors is balanced against the presumption that the procedural rule comports with constitutional due process requirements. *Id.* We follow our procedural rules, which bar review of this complaint, unless a recognized exception exists. *See B.L.D.,* 113 S.W.3d at 351–52. While the interests involved are similar in *M.S.* and the case at bar, the risk of erroneous deprivation is lessened for sufficiency issues because a competently acting counsel will preserve those issues that present reversible error. Our confidence in the outcome would be too seriously eroded by a trial in which counsel did not perform competently. As applied to the generality of cases,[6] the risk of an erroneous legal or factual sufficiency determination, *in the absence of ineffective assistance of counsel,* is not so great that the procedural rule must yield in all cases where the rights of a parent have been terminated. Our holding is consistent with *B.L.D.,* in which the court implicitly declined to apply the fundamental error doctrine in the manner sought by the Luckeys. *See B.L.D.,* 113 S.W.3d at 351 ("We are aware of no precedent in either our criminal or civil jurisprudence that informs the court of appeals' conclusion that 'core' jury charge issues in termination cases should be reviewed even when not preserved. Further, we cannot see any reasonable, practical, and consistent way of reviewing unpreserved complaints of

charge error in termination cases that satisfies our narrow fundamental-error doctrine."). Therefore, we will review only the properly presented legal sufficiency issues.

The Department intervened because they received a priority one report regarding the youngest child, six-week-old S.L.L. When the caseworker, Kari Kennedy, arrived at the Luckey residence, she noticed that two-year-old S.A.S. and three-year-old S.G.S. were wearing heavily soiled diapers and had cuts on their skin caused by wearing diapers that were too small for them. Thirty minutes elapsed before Penny changed their diapers. Infant S.L.L.'s skin was loose in folds and there was no fat or muscle on his buttocks. He was lethargic and did not follow her finger with his eyes. S.L.L. did not cry or move. Asked how she was feeding the baby, Penny reported that she fed the baby two ounces of formula every three hours. When she demonstrated the feeding procedure, however, Penny put one scoop of formula powder into four ounces of water and explained that she had recently moved the baby up from two to four ounces. Kennedy questioned Penny about the formula, and calculated that they had consumed only eleven days' supply of formula in five weeks. Kennedy noticed there was only one queen-sized mattress in the entire house, and no furniture other than one love seat. The baby was sleeping on a blanket on the floor. There was no crib or playpen, and no food in the house. S.G.S.'s front teeth were black and gray. Penny reported that she had never taken S.G.S. to the dentist. S.A.S. had not been to the doctor in over a year. Penny re-

---

**6.** "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Eldridge,* 424 U.S. at 344, 96 S.Ct. 893. The Luckeys do not suggest that any particular facts attendant to their case render an otherwise constitutional procedure unconstitutional as applied to them.

ported that S.L.L. was born four weeks premature and that she had not taken S.L.L. to his follow-up appointment with the doctor. Penny had let the girls' Medicaid benefits lapse. Kennedy transported Penny and all three children to the hospital emergency room. The two girls had diarrhea but did not require emergency medical treatment and were released to the custody of Shawn's sister. They remained with their aunt for the first month, but that arrangement ceased after a physical altercation between Shawn and his brother-in-law, and the children were placed with foster parents. According to Kennedy, the Luckeys were unable to produce a voluntary placement for any of the children.

The Department adduced testimony from doctors, social workers, and family members in support of the allegations in its petition. The youngest child, S.L.L., was born prematurely. Penny's stepfather testified that when he saw the child, S.L.L. looked like a normal premature baby and did not look as emaciated as he was in the photograph taken on the day S.L.L. was transported to the emergency room. He did not have the sagging skin and bony appearance evident from the photograph. According to his pediatrician, Dr. Uma Kanojia, S.L.L. was admitted into the hospital emergency room at six weeks of age because he was not gaining weight. Weighing 2,225 grams at birth, at six weeks he weighed 2,100 grams. S.L.L. should have weighed at least 3 kilograms; instead, he weighed just 2.1 kilograms. His initial temperature was 96, and he was in critical condition. A low temperature could be caused by insufficient caloric intake to maintain temperature, or by improper wrapping of the baby. The emergency room physician determined that Penny was preparing the formula improperly, by mixing one scoop of powder with four ounces of water rather than two ounces of

water. After his admission into the intensive care unit, S.L.L. gained 400 grams in four days, confirming inadequate caloric intake as the reason for the child's failure to thrive. Had the malnutrition continued, S.L.L. would have been at risk of death. Ginny Judson, a Department foster home and adoption supervisor, testified that the photograph of S.L.L. depicted severely emaciated extremities from lack of nourishment. A premature but healthy baby would be proportional, as S.L.L. was not. He had definitely lost weight in his extremities since birth. The Luckeys testified that Penny telephoned the hospital for advice on S.L.L.'s regurgitating of his formula, and someone advised Penny to dilute the formula. Shawn testified that he had left to work on a job on the day before the baby was taken to the hospital.

The children's foster mother testified that when he initially came into her care, S.L.L. required physical therapy, massage, and exercise to loosen limbs that were drawn up. He began walking at thirteen months of age. At the time of trial, he had all of his motor skills but his speech was delayed. At eighteen months of age, he weighed 28 pounds. The children's pediatrician testified that S.L.L.'s development has been normal since his placement into foster care.

Gail Rexses, the counselor who worked with the Luckeys, testified that Penny did not realize that S.L.L. was not well. Rexses scheduled weekly visits with Penny for joint family counseling, but after the first few weeks the Luckeys began missing appointments, then discontinued the visits entirely. According to the counselor, the Luckeys did not appreciate that their poor care of the children led to medical problems, but were focused on the actions of family members who may have instigated the Department's intervention.

Family members testified that before removal, the two girls were always dirty. They ate their meal on the kitchen floor with their hands. According to Penny's stepfather, S.G.S. was not potty trained at age three and could not speak a word. At the time of removal, S.G.S. would parrot words but did not comprehend anything being said and could not enunciate and pronounce words.

The foster mother testified extensively about the condition of the children when they entered foster care. S.G.S.'s teeth were rotten. At trial, Shawn attributed S.G.S.'s rotted teeth to a fall she sustained, and claimed that they had telephoned a dentist who told them that there was really nothing they could do and not to worry because her baby teeth would fall out anyway. He understood that Medicaid paid 100 percent of all dental work. Once in foster care, S.G.S.'s decayed teeth were pulled and her teeth were capped after the abscessed infection in her gums cleared. S.G.S. was not potty trained at three-and-one-half years of age, but the foster mother simultaneously potty trained both girls in two months. S.G.S. had no knowledge of household things like a shoe, a pillow, a fork, or a plate. Teaching her was like teaching a different language. She would point to an object that she wanted, but she could not follow simple instructions. By the time of trial, S.G.S. was a little behind in school and was enrolled in classes for children with learning disabilities, but she knew her colors and could obey simple commands. The foster mother compared the girls' cultural experience with that of non-English speaking Vietnamese children she had fostered. Neither girl could eat with utensils and they ate like they were starving. The two girls did not interact together and play.

At two years and nine months of age, the middle child, S.A.S., was very scared and uncooperative. Penny's stepfather observed that she, too, did not speak a word. For months after moving in with the foster family, S.A.S. had temper tantrums than would last for thirty to forty-five minutes. The foster mother took S.A.S. to a psychiatrist, who medicated S.A.S. for a few weeks. S.A.S.'s socialization improved and she learned how to play. Jennifer Gore, a witness who worked with the children in a program for young children with developmental delays, testified that S.A.S. was developmentally delayed in all areas in her first evaluation. At 27 months of age, she had a 22–month–old communication level and 24–month–old cognitive level. She could not name common objects like a cup or a spoon or a chair, nor could she name farm animals or their sounds. When retested at 35 months of age, the child showed progress in all areas but motor skills. Gore attributed this progress to interaction with the foster parents. By the time of trial, S.A.S. was very cooperative and behaved like a normal three-year-old. When assessed for age three special education, S.A.S. did not have a disability that qualified her for the program.

The evidence at trial regarding the children's physical environment focused on two matters: (1) a failure to provide a stable home and (2) a gas leak at the residence at the time of removal. When Penny gave birth to her first daughter, she was living in Orangefield with her sister and nieces. Shawn lived elsewhere. Shawn and Penny moved into a trailer park in Buna with Shawn's aunt and uncle. About the time the younger daughter was born, the Luckeys moved in with Shawn's parents, who lived in a trailer in Buna. The trailer had a wood stove and caught fire and burned. The Luckeys moved to Sour Lake and lived in a home owned by Shawn's boss about the time their third child was born. That home had a gas leak and no running water. A few weeks later,

the Department intervened and removed all three children. After removal, the Luckeys tried to prepare a home in Buna for the children, but they could not maintain its electric service, and never moved in. At the time of trial, the Luckeys were living with cousins in Silsbee. For sleeping accommodations they used a fold-out-couch in the living room. Penny's plan for the return of the children was to move in with an aunt in Buna. Shawn testified that he would rent a trailer home from his cousin. That home needed to have the bathroom replaced because a water leak had rotted out the floor.

Penny's stepfather, Ross Dennis, testified that he smelled a gas leak when he visited Penny and her new baby. He was concerned because the baby slept all the time. Dennis and his wife warned Penny that there was gas in the house and it might be doing harm to her and to the children. A week later Penny called and told them that the leak had been fixed. Feeling skeptical, the Dennises checked again and discovered the gas problem was still there. According to Dennis, the gas was so bad that it drove them from the house. Penny testified that she called the landlord and took care of the gas leak. After the incident with the gas leak, she started having problems with her mother because her mother argued with her in front of the kids and accused her of lying about calling the gas company.

The trial court entered a temporary order on October 23, 2000, to which Penny and Shawn agreed. The trial court placed the children in the Department's custody and ordered Penny and Shawn to attend counseling sessions and to comply with the Department's service plan. In addition, Shawn was ordered to pay the Department $300 monthly for support of the children. Some of the tasks set for the parents in the service plan for the period of time from October 2000 to March 2001 include the following: (1) Shawn and Penny were to share more of the child-rearing responsibilities and attend family counseling; (2) they were to seek and use assistance in carrying out family responsibilities by attending individual counseling; (3) they were to learn to manage income to meet the family's basic needs by demonstrating the ability to properly use their financial resources; (4) they were to use parenting practices to meet their children's emotional and developmental needs by participating in parenting classes; (5) they were to demonstrate the ability to maintain appropriate housing by maintaining proper housing; (6) Shawn was to demonstrate the ability to achieve financial independence by maintaining employment and paying child support; and (7) they were to submit to psychological examinations and follow the recommendations. Kennedy testified that Penny and Shawn did submit to psychological evaluations but failed to attend counseling. Although it had been offered, the Luckeys had not attended any parenting classes at the time of the status hearing. Penny informed Kennedy that she did not have $10 to cover the cost of the parenting classes. There was no charge for the counseling and no explanation at that time for their failure to attend. Although Penny had been attending her biweekly visitation with the children, Shawn did not attend any visits between October 2000 and January 11, 2001.

The subsequent service plan, entered on February 21, 2001, called for adoption. That service plan set the following goals for February through June 2001:(1) Shawn and Penny were to learn to manage income to meet the family's basic needs by demonstrating the ability to properly use their financial resources; (2) they were to use parenting practices to meet their children's emotional and developmental needs by participating in fourteen parenting

classes; (3) they were to demonstrate the ability to maintain appropriate housing by maintaining proper housing; (4) Shawn was to demonstrate the ability to achieve financial independence by maintaining employment and paying child support; (5) Shawn and Penny were to share more of the child-rearing responsibilities by attending weekly family counseling sessions to address burden-sharing and past relationship issues; (6) they were to demonstrate the ability to maintain regular contact with the children by attending family visits twice a month; and (7) the Luckeys were to address past abuse history and anger management issues by attending weekly counseling sessions to work on self-esteem issues and anger problems. The Luckeys demonstrated more effort to comply with the second service plan. They attended some counseling sessions, Shawn began attending visitation, and he tried to maintain employment. Penny and Shawn were married February 16, 2001. In May and June, the Luckeys began missing their counseling and visitation sessions again. Then Kennedy visited the Luckeys' current residence and decided it was not safe enough for the children to visit there. In July, the Luckeys failed to visit their children at all. Also in July, an automobile accident left Penny hospitalized for several days. After a July 30 review hearing, the Department arranged to bring the children to the Luckeys' home for twice-weekly visits; when Kennedy arrived with the children for their first visit, no one was home. No one was home for the second in-home visit either. Although Penny was home for the third visit, the residence was infested with insects and the visit terminated early because it was intolerably hot inside. Penny told Kennedy that she was actually living with friends. The visitation schedule changed in August, and the home visits ceased. The Luckeys did not come visit their children again before the January

2002 trial. They made no contact at Christmas 2001 and sent no presents to the children.

The Department offered parenting classes that covered subjects such as child development, parenting techniques and discipline, and child-proofing the home. The Luckeys actively participated when they were actually present in class, but Shawn attended only the first four and Penny the first five of eight parenting classes. Shawn attributed his failure to abide by the counseling requirement to his lack of funds. He needed money to pay people to provide transportation to the classes. He also claimed that they moved so many times while the children were in foster care so that he could be close to family members who would take him to all of the meetings, and he attributed the frequent moves to the Department's insistence that he take all the classes. Penny also attributed their failure to visit the children the five months before trial to not having money for gas. The issue of lack of transportation arose frequently during the trial. Kennedy testified that she gave Penny an information sheet on Southeast Texas Transit, which upon 48 hours notice provides transportation in Hardin, Orange, and Jefferson counties for a fee of about $1.50. Penny testified that she called the company and was told that the fee was $3.00 each way.

Shawn testified that he understood that he had agreed to pay $300 monthly child support. He is employed sporadically as an ironworker for about $15 per hour. He usually makes $300 per week, and admitted that he had not paid child support. His one $90 child support payment was the result of a wage withholding order; after his pay was withheld, he quit that job. He claimed in June 2001 he was working approximately 50 hours per week. At the time of trial, Shawn had been unemployed

for four or five weeks. Shawn attributed his failure to attend parenting classes and visitation to working or to lack of transportation. The family's expenses were $500 per week. He received $5000 in tax refunds for the 1999 and 2000 tax years, which he used to purchase cars. He could not testify to his income for any year. During times that he was not working, he received food stamps. Shawn explained that beyond paying people for gas and paying rent and utilities, he is broke.

In Ross Dennis's opinion, Penny has no parenting abilities. He felt that she is very insecure and neither physically, nor mentally, nor emotionally capable of taking care of the children at any age. Termination would be in the best interest of all three children. Dennis also testified that Shawn lost his temper with S.G.S., picked her up by one arm, and threw her in the bed, then spanked her legs. Shawn is aware of Penny's deficiencies and knowingly left the children in her care. Penny's mother, Joyce Dennis, also testified that, in her opinion, Penny and Shawn are not capable of taking care of the children and it would be in the children's best interest to terminate the parents' rights to them. She did not believe that Shawn could financially provide for the children, and he is never there to help Penny with the children. Penny loves her children but does not grasp their needs. The children have not had basic things that they need to survive.

According to Ginny Judson, the adoption coordinator, long term placement in foster care, as opposed to adoption, greatly increases the instability of the child's relationships and the likelihood of separation of siblings. If the Luckeys' parent-child relationships were not severed, the Department's plan would require long term foster care and the children's return to the parents. In her opinion, there was a very high likelihood that the children would be neglected again and return to the system. In cases where the children are young, their attachment to the parents is severely disrupted when the parents fail to visit for months. She, too, testified that in her opinion the best interests of the children would be served by termination.

The foster mother testified that the three Luckey children have resided in her home since September 2000. She has fostered 42 children and adopted one. The foster mother encouraged the children to bond with their mother, but they bonded with the foster mother, not Penny, and S.G.S. refers to Shawn as Penny's daddy. The foster parents desire to adopt the Luckey children and intend to apply for adoption if the Luckey's parental rights are terminated.

Although Shawn claimed that he sometimes changed, bathed, and fed the children, it is clear from the record that Penny was the children's caregiver. Shawn testified that Penny has no deficiencies as a parent and that he is confident in his wife's present ability to do everything necessary for the children. He agreed that some of his children's problems were his fault, because he was working out of town during the week and coming home on weekends. Shawn testified that the children called him daddy, but it made him feel weird and old, so he told them to call him Shawn. Asked what he personally did to improve his parenting skills, Shawn said that he played with his cousin's niece. Asked if he was presently able to support himself and his wife, Shawn replied that he could not at the moment because he had turned down work to be in court. He anticipated securing a two-year job at $17.50 per hour because Fina was going to build a new unit.

 "Endanger" means to expose to loss or injury or to jeopardize. *Texas*

*Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). While it requires more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, if the evidence shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding of endangerment is supportable. *Id.* In contrast to *In the Interest of P.S.*, 766 S.W.2d 833, 839 (Tex.App.-Houston [1st Dist.] 1989, no writ), in which the children's detrimental development was not firmly attributed to any act or omission by the parent, the instant case contains clear and convincing evidence of neglect. At six weeks of age, S.L.L. was critically ill from lack of nourishment. From the evidence adduced at trial, the jury could reasonably find that S.L.L.'s condition was not a symptom of a brief bout of intolerance to his food but was caused by his parents' failure to feed him adequate nutrition. The jury could also reasonably find that S.G.S.'s rotted teeth resulted from avoidable neglect rather than from injury, and that both S.G.S.'s and S.A.S.'s developmental delays were caused by Penny's and Shawn's failure to expose their daughters to even minimal training and socialization. The jury could also infer from the actual harm to one child that the physical and emotional well-being of the other children were also jeopardized. The evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that both Penny and Shawn engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.

One ground for termination is met if the child is placed in conditions or surroundings that are themselves danger-ous to his or her physical or emotional well-being, provided the environment poses a real threat of injury or harm to the child. *In the Interest of N.R.*, 101 S.W.3d 771, 776 (Tex.App.-Texarkana 2003, no pet.). It is not necessary for the parent to have certain knowledge that an actual injury is occurring; it is enough that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *Id.* In *Williams v. Texas Dep't of Human Servs.*, 788 S.W.2d 922, 927 (Tex.App.-Houston [1st Dist.] 1990, no writ), *overruled on other grounds by In the Interest of J.N.R.*, 982 S.W.2d 137, 143 n. 5 (Tex.App.-Houston [1st Dist.] 1998, no pet.), the only evidence of environmental danger consisted of evidence that the mother did not have a home of her own and constantly changed locations over a two month period. The evidence of the Luckeys' environment, however, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact also could have formed a firm belief or conviction that the children's living conditions resulted in actual, rather than theoretical, peril for the children. The Luckeys failed to provide a stable and safe living environment for their children. The testimony regarding their income was extremely vague and often contradictory, but much of the Luckeys' hardship was obviously attributable to their impoverishment. Nevertheless, the evidence reveals more than mischance: the Luckeys failed to secure for their children the basic necessities of life even to the extent available through public assistance.

The Luckeys also failed to comply with the court order that specifically established the actions required to obtain the return of the children. Penny initially demonstrated substantial efforts towards compliance, but Shawn did not. He paradoxically claimed that he did not visit the children or attend counseling and parent-

ing classes because he was working, then claimed that he did not comply with the child support order because he was unemployed. Likewise, the Luckeys claimed that they failed to comply with the orders because they lacked transportation, but they purchased two vehicles during the time period in question and it is evident from the record that at least part of the time they did have access to transportation. In the case relied upon by the appellants, *Doria v. Texas Dep't of Human Resources,* 747 S.W.2d 953, 958 (Tex.App.-Corpus Christi 1988, no writ), the mother attended a large number of parental skill classes, held two part-time jobs, and substantially corrected defects in the home despite her low intelligence and poverty. While there are similarities between hardships facing the Luckeys and the parent in *Doria,* at the time of trial the Luckeys had not visited their children in months, they had not implemented their plans to secure a place for the children to live, and they had not acquired the skills necessary to attend to even the basic needs of the children. The evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that both Penny and Shawn failed to comply with the family service plan as ordered by the trial court.

 In reviewing the finding that termination of parental rights is in the best interest of the children, we consider the non-exhaustive list of elements described in *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976):(1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best

interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

The foster mother testified that the children had bonded to her and her family, and while they liked to see Penny, they did not have a close relationship with Shawn. The foster parents' intent was to adopt the three children if parental rights were terminated. S.G.S. and S.L.L. were, at the time of trial, still experiencing developmental delay and were receiving special educational services. The Luckeys were woefully inadequate parents, and did very little to improve their skills in the eighteen months following intervention. Their problems were exacerbated by poverty but not caused by it; they had failed to take advantage of free services that would have addressed the children's basic needs. The children suffered severe health problems and significant developmental delay while in the care of their birth parents. There are social programs available to provide training and financial assistance, but the Luckeys did not utilize those services to obtain and maintain a stable living environment for their children. On the other hand, Shawn and Penny obviously love S.G.S., S.A.S., and S.L.L. and desire to raise the children within their limited means. Unfortunately, by the time of trial they had yet to implement a sound plan for raising any of the children. Shawn's poignant testimony illustrates the situation:

Q. [By Attorney Ad Litem] Maybe I should be more specific. What are your plans for [S.G.S.] if she comes home to you?

A. [By Shawn Luckey] Well, what do you mean specifically? Just ...

Q. In your mind what are the plans that you've made for [S.G.S.]?

A. Take her to—put her down there in Buna school in that early start, that deal down there in Buna.

Q. Okay.

A. Seeing how she adjusts to being in that part. Basically just trying to be a family again. Trying to get them used back to me and me just going—I don't know. I just—right offhand I can't—I don't know how it's going to be between all of us again.

Q. What about [S.A.S.]? What [are] your plans for [S.A.S.]?

A. I can't—[S.A.S.]'s—I don't know. I just—I just want us all to be a family again.

Q. And [S.L.L.]? Do you have any special plans for [S.L.L.]?

A. To be a family. About—I just want to be a dad again. I want my kids back so I can love them. I just—that's all my special plans. I want to love my kids.

The Luckeys rely on two cases in support of their argument that the Department failed to prove that termination is in the children's best interest. Termination of a mother's parental rights was overturned in a case where the court held that "termination is not justified where the evidence shows that a parent's failure to provide a desirable degree of care and support of the child is due solely to lack of intelligence, training, or misfortune." *In the Matter of R— E— W—*, 545 S.W.2d 573, 582 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.). The appellate court attributed the mother's parenting inadequacies to physical and emotional disabilities and noted that the mother had met with some success in her effort to conform to the Department's requirements. *Id.* However, the reversal was based upon insufficient evidence of endangerment, not insufficient evidence that termination would be in the best interest of the child. *Id.* The termination of the mother's parental rights was also overturned in *Clay v. Texas Dep't of Human Resources*, 748 S.W.2d 598 (Tex.App.-Waco 1988, no writ), a case in which an abusive husband circumvented the mother's efforts to meet her children's needs. The appellate court held that the mother posed no danger to her children; the only danger arose from the now-absent father. *Id.* at 601. That case, too, was reversed for insufficient evidence of endangerment. *Id.* Thus, neither case stands for the proposition that the *Holley* factors are to be weighed in such a manner that termination cannot be justified in a case where the parents' failure to provide a desirable degree of care and support of the children is due solely to lack of intelligence, training, or misfortune.

Of course, any excuse for the acts or omissions of the parent is one of the recognized *Holley* factors. *Holley*, 544 S.W.2d at 372. There is evidence in the record that Penny did not wilfully neglect the children. Evidently, Penny's limited intelligence affected her ability to learn how to care for the children and to apply care instructions provided by others. The Department offered counseling and parenting classes, some of which Penny attended, and the Department assisted her in obtaining Social Security benefits and in applying for food stamps, but Penny felt that the social workers were not trying to achieve reunification because early in the process Kennedy talked to Penny privately and suggested that Penny and Shawn should sign their rights in the kids over to the foster mother. Shawn attributed his failure to visit the children to his working out-of-town. He also claimed that he did

not pay child support because he was often unemployed. Penny testified that they missed much of the counseling and many scheduled visits because transportation was unavailable. Thus, the Luckeys presented excuses for their failure to meet their goals in the family service plan, and we concede the neglect suffered by the Luckey children was at least partially attributable to forces beyond their parents' control.

However, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that terminating Penny's parental rights is in the best interest of S.G.S., S.A.S., and S.L.L. We further conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that terminating Shawn's parental rights is in the best interest of S.G.S., S.A.S., and S.L.L. We conclude that the evidence is legally sufficient to support the jury's verdict in this case.

 Our inquiry does not end with our conclusion that the civil rules permitting procedural default of sufficiency issues comport with due process in appeals in termination cases. We consider whether specific facts of this case compel a different application of our procedural rules. *See B.L.D.*, 113 S.W.3d at 354. Although

they do not raise points of error on effectiveness of counsel, we are mindful of the fact that both Shawn and Penny are represented on appeal by the same attorneys who represented them at trial. If effectiveness of counsel were an appellate issue, the resulting conflict of interest would compel the attorneys' withdrawal from the appeal and the appointment of new counsel to brief the issue. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A (TEX. STATE BAR. art. X, § 9). We could order appointment of new counsel as a prophylactic measure, but "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26. Removal of the children from the home occurred some thirty-eight months ago, and we hesitate to extend the period of time in which the children's futures are held in limbo while new attorneys review the extensive record and re-brief the case. Such a delay is justified only if we conclude that an actual conflict exists. After a thorough review of the entire record, particularly the disputed evidence, we cannot conclude that the record presents a serious question that the failure to preserve the sufficiency issues was unjustified and fell below being objectively reasonable. Therefore, we decline to order appointment of new counsel.[7]

---

7. We recognize the irony inherent in the system, which requires counsel to identify the points to be relied upon no later than 15 days after the date the final order is signed. *See* TEX. FAM.CODE ANN. § 263.405(b) (Vernon 2002). It is, perhaps, inadvisable for trial counsel to act as appellate counsel if his effectiveness is a potential issue, but it is not reasonable to expect new counsel to obtain and review the reporter's record in so short a period of time. Perhaps we also demand the

impossible when we expect the court reporter who has been sitting through the trial to transcribe the record in time for new counsel to review the record and identify the points to be relied upon. Between guardian ad litem and attorney ad litem appointments and appointment of attorneys to represent each parent at trial and appointment of new attorneys on appeal, a judge presiding in a court located in a rural county may quickly run through the

Issue three is overruled.

 Both Shawn's and Penny's fourth issues contend the trial court's admission of the "Temporary Order Following Adversary Hearing" and the "Permanency Hearing Order" amounts to testimony by a judge in violation of Rule 605 of the Texas Rules of Evidence. This objection was not raised at trial but the Rule provides that no objection need be made to preserve the point. TEX.R. EVID. 605. Rule 605 precludes the judge presiding at the trial from testifying in that trial as a witness. *Id.* The Honorable David A. Dunn presided over the trial. Therefore, the "Temporary Order Following Adversary Hearing," signed by the Honorable Britt Plunk, is not testimony of the judge presiding at the trial. Likewise, the "Status Hearing Order" signed by Judge Plunk on December 5, 2000, was not testimony of the judge presiding over the trial. Judge Dunn signed the July 30, 2001, "Permanency Hearing Order." That order contained the following findings:

> The Court has reviewed the status of [S.G.S., S.A.S., and S.L.L.] to determine the safety of the children, the continuing necessity and appropriateness of the placements, the extent of compliance with the case plan, the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the children may be returned to and safely maintained in the home or placed for adoption or in a permanent managing conservatorship, as applicable. The Court finds that the Department has made reasonable efforts to finalize the permanency plan that is in effect for each child.

. . . .

> The Court finds that neither of the child's parents nor any other person or entity entitled to service under Chapter 102, Tex. Fam.Code is willing and able to provide the child [S.G.S.] with a safe environment, and therefore return of the child to a parent or other person or entity is not in the child's best interest; the child continues to need substitute care and the child's current placement is appropriate for the child's needs.

. . . .

> The Court finds that neither of the child's parents nor any other person or entity entitled to service under Chapter 102, Tex. Fam.Code is willing and able to provide the child [S.A.S.] with a safe environment, and therefore return of the child to a parent or other person or entity is not in the child's best interest; the child continues to need substitute care and the child's current placement is appropriate for the child's needs.

. . . .

> The Court finds that neither the child's parents nor any other person or entity entitled to service under Chapter 102, Tex. Fam.Code is willing and able to provide the child [S.L.L.] with a safe environment, and therefore return of the child to a parent or other person or entity is not in the child's best interest; the child continues to need substitute care and the child's current placement is appropriate for the child's needs.

In its recent consideration of this issue in *M.S.*, the Supreme Court stopped short of holding that the admission of an order containing findings of fact violates Rule 605. *M.S.*, 115 S.W.3d at 538 ("A judge's findings of fact are not technically the same as testimony."). The Court did, however, express its concern that where the

entire available pool of family law practition- ers.

jury is permitted to see the judge's findings, and those findings are the very ones that the jury is being asked to find, the findings amount to an impermissible comment on the weight of the evidence. *Id.* The Court explained, "To be clear, admitting the orders as evidence in support of the Department's position that [the mother] failed to comply with the orders of a court was not in itself inappropriate. However, the trial judge's factual findings that his order had, in fact, been violated, should have been redacted, so that the jury could draw its own conclusions as to whether [the mother] had complied." *Id.* The court recognized that error had not been preserved, but found the error to be harmless in any event because the record contained ample evidence that the orders had, in fact, been violated. *Id.* at 538–42.

■ The appellants argue that they were harmed because the findings informed the jury that the trial judge had already decided that they could not protect their children. In effect, they argue that the findings were a comment on the weight of the evidence, which is what makes their admission erroneous, not what makes them harmful. We examine the entire record to determine if the appellants were harmed by the erroneous admission of evidence. *Id.* at 538. Neither the Department nor the children's ad litem attorneys specifically based any of their arguments on the trial court's fact-findings. In fact, the only possible references to the order in question came during Shawn's jury argument, when counsel stated, "But their own witnesses get up there and they said, oh, it is common that whatever's done and presented by CPS to the Judge, that's what he's going to sign," and during Penny's jury argument, when counsel stated, "And then they present that plan to the Judge and they say the Judge has the final say-so. Well, the Judge hears what CPS says and

says okay." Finally, there was ample evidence otherwise that the Luckeys did not comply with the trial court's order. For example, there was evidence, discussed in greater detail in our sufficiency review, that the Luckeys did not secure a safe residence in which the children could live, and the Department's contact narrative reveals that the potential voluntary placements fell through and the Luckeys repeatedly missed scheduled parenting classes and counseling sessions in the months before the judge signed the Permanency Hearing Order. Both Shawn and Penny failed to show that, but for the admission of the orders into evidence, the jury would have reached a different conclusion as to the termination of his or her parental rights. *Id.* at 538, 542. We therefore conclude no harm resulted from the error.

Issue Four is overruled. The judgment is affirmed.

AFFIRMED.