TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00284-CV






Moses Hernandez, Appellant




v.




Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT


NO. 2002009, HONORABLE ROBERT HOFFMANN, ASSOCIATE JUDGE PRESIDING 






M E M O R A N D U M O P I N I O N




 Moses Hernandez appeals a final decree terminating his parental rights to three
children, M.H., M.A.H., and A.L.H. See Tex. Fam. Code Ann. § 161.001(1), (2) (West 2002). On
appeal, he argues that the evidence is insufficient to support the statutory termination grounds on
which the trial court relied. Hernandez, who was incarcerated at the time of trial, also complains that
the trial court acted improperly in proceeding in his absence, that he was not properly served, and
that various inconsistencies between the filings in the Clerk's Record and corresponding documents
introduced into evidence at trial demonstrate that his due process rights were violated. We affirm
the final decree. 


BACKGROUND


 M.H., M.A.H., and A.L.H. are the children of Hernandez and Christi Marie Silva. 
Although Silva was still married to another man, she and Hernandez had a romantic relationship for
an approximately seven-year period ending in 2002. Although the pair often lived together, their
relationship was frequently interrupted by periods in which Hernandez was incarcerated. Silva later
estimated that Hernandez was behind bars for as much as six months out of each year of their
relationship. 

 M.H. was born in November 1997, M.A.H. in March 1999, and A.L.H. in January
2000. In December 2001, during one of Hernandez's periods of incarceration, Silva left the three
younger children at the house of her mother, Laura Aguilar, in Brady. Aguilar had previously gained
custody of three older children whom Silva had conceived with her estranged husband. Aguilar
eventually called the Department on January 30, 2002, explaining that she could not care for the
additional three children and expressing concern regarding their welfare with Silva and Hernandez. 
The Department took emergency custody of M.H., M.A.H., and A.L.H. and placed them in foster
care.

 In February 2002, following a hearing, the district court entered a temporary order
appointing the Department temporary sole managing conservator, granting Silva and Hernandez
(who was then out of jail) limited supervised visitation rights, and mandating that each parent meet
certain requirements as a condition for possible reunification. Hernandez's conditions included
undergoing psychological or psychiatric evaluation; completing counseling, parenting classes, and
substance abuse assessments and any recommended treatment; and complying with the Department's
family service plan and any amendments thereto. In early March, the Department and Hernandez
agreed to a family service plan whereby he would obtain full-time employment and safe housing,
stay away from firearms, and attend scheduled visitations with the children. (1) The trial court
approved this plan by order following a hearing later that month.

 In April 2002, Hernandez was incarcerated again after an incident in which he
assaulted Silva and gave her a black eye. After Hernandez was arrested for the assault, law
enforcement officials discovered several outstanding state and federal arrest warrants. From April
2002 through the time of trial, Hernandez remained incarcerated in various state and federal penal
institutions. In October 2002, the trial court appointed an attorney ad litem for Hernandez, who filed
a general denial on his behalf. An additional family service plan regarding Hernandez, similar to the
prior version, was filed at this time. 

 In February 2003, the trial court entered an agreed final order appointing the
Department as permanent sole managing conservator and granting Silva and Hernandez limited
supervised visitation rights. The order expressly reserved the Department's right to seek termination
of Silva and Hernandez's parental rights without the need to prove change in circumstances and to
utilize evidence predating the order in support for such an action. After having explored various
relative placements, the Department placed the children with their maternal great-aunt and great-uncle, Belinda and Johnny Culp. The Culps have cared for the children since February 2003 and
have expressed a desire to adopt them. 

 In August 2003, the Department filed a new petition seeking termination of Silva and
Hernandez's parental rights to enable the Culps to adopt the children. At an October hearing, the
trial court set the case for bench trial in February 2004. Hernandez was represented at this hearing
by his attorney ad litem, Stephen Harpold. Although Hernandez had not requested to be bench
warranted for trial, the trial court sua sponte addressed the issue of whether or how Hernandez would
participate in trial. The trial court determined that Hernandez's physical presence at trial was not
essential to protect his rights and that his rights could be adequately protected (1) through Harpold's
representation and (2) by allowing Hernandez, with Harpold's assistance, to prepare an affidavit
containing the testimony he would have offered at trial. See In re Z.L.T., 124 S.W.3d 163, 165 (Tex.
2003).

 The trial court also ordered the case to mediation in advance of trial. During the
mediation, Harpold understood that Hernandez would agree to an order terminating his parental
rights. Following the mediation, however, Hernandez refused to communicate with Harpold despite
numerous attempts to contact him by phone or mail. Harpold ultimately resorted to attempting to
contact Hernandez through Hernandez's prison counselor. The counselor advised Harpold that
Hernandez would neither sign the termination agreement nor speak to Harpold or anyone else
regarding the case. Harpold continued attempting, without success, to contact Hernandez until trial. 

 On the date of trial, Harpold moved for a continuance and to withdraw, citing his
inability to communicate with Hernandez and either to obtain an agreed order or to prepare an
affidavit for trial. The trial court denied these motions and proceeded to hear evidence. Silva
voluntarily relinquished her parental rights and testified at length that it was in the children's best
interest that her own and Hernandez's rights to the children be terminated so that the Culps could
adopt them. In particular, Silva testified that:



 Hernandez rarely worked and that the only money he ever had was what his
father gave him.

 Hernandez used drugs while he lived with Silva and the children, that she
witnessed him intoxicated in front of the children, and that he smoked marijuana
in the presence of the children. 

 Hernandez had a violent temper and he "routinely" blew up at her in front of the
children. She described one incident in which he, while under the influence of
drugs, pulled her hair and threw her across a room in the presence of the
children.

 Hernandez had quarreled with her over money she needed for clothes and shoes
for M.H. because he was starting HeadStart. Hernandez reacted by grabbing
M.H. and leaving with him without Silva's permission. 

 Later, M.A.H., A.L.H., and another of Silva's boyfriends were all waiting in a
car outside a convenience store while Silva was inside using the restroom. 
Hernandez approached on the driver's side and punched the boyfriend in the
face, grabbed M.A.H. out of the back of the car and took her with him. 
Hernandez kept M.H. and M.A.H. away from Silva for two months until the
place he was staying with the children was "busted" and Silva was able to
retrieve them. 




 One of the children's caseworkers, Linda Scalf, testified that Hernandez admitted to
her that he was "involved with people who use drugs." When they were removed, both M.H. and
M.A.H. reportedly asked the shelter staff and the foster mother for a "cold beer." M.H. told them
that he and his sisters were allowed to drink beer and smoke cigarettes, but that marijuana was only
for grown ups. (2) 

 In her investigation, Scalf said she learned that Hernandez "kept weapons and had
threatened people with weapons in the past." Scalf testified that the children indicated to her several
times that they were scared of Hernandez and did not want to be returned to Silva and Hernandez. 
Scalf explained that after removal the children demonstrated deviant behavior consistent with abuse
and neglect. She said that M.H. displayed angry outbursts, aggression towards his sisters, bed
wetting, aggression towards adults, and aggression towards his mother during her visits. The
children had nightmares and woke up expressing fears that Hernandez was coming after them. 

 All three children acted out sexually. The foster mother found M.H. and M.A.H. in
bed together simulating a sex act. M.H. told the foster mother that they were having sex. M.H. told
his therapist that he witnessed Hernandez having sex with Silva and with other women; he also said
he saw Silva having sex with other men. He was able to describe the various sex acts that he
witnessed. M.H. was also able to describe the events of an arrest by the police. He described
incidents when Hernandez hurt Silva in front of him. 

 All of the children described a chaotic, unstable lifestyle with their parents, having
to move from house to house and being left with numerous babysitters. M.H. also described being
hungry and having to sleep in a car that did not run. The children reportedly improved dramatically
in the custody of the Culps and were thriving. Scalf testified that the children showed immediate
improvement when placed in a safe, stable environment.

 Scalf also testified about Hernandez's failure to comply with the court's conditions 
for reunification. Scalf testified that both she and the court explained to Hernandez the importance
of satisfying these requirements within a certain time frame in order to have the children returned
to him. Scalf said that she spent one and a half to two hours explaining these requirements to
Hernandez on the day of the February 2002 hearing. She advised him that the Department would
pay for all the court-ordered services. To make it convenient for him, Scalf scheduled all of
Hernandez's court-ordered services in Brownwood, where he was living at the time. Scalf provided
Hernandez with the name, address, and telephone numbers for the appropriate mental health
professionals and told him to make arrangements for both the psychological evaluation and
individual counseling. 

 Nonetheless, between the time of the court's order in February 2002 and his arrest
in April, Hernandez failed to comply with any of the conditions for reunification--he did not submit
to a psychological evaluation or to a substance abuse assessment, and he did not attend counseling,
parenting classes, or anger management classes. He had obtained a job but held it for only a few
weeks. Hernandez attended only one scheduled visit with his children in March 2002. He failed to
attend a status hearing for the children held on March 21. Scalf testified that Hernandez did not
accomplish even one of the requirements.

 Scalf detailed her efforts to assist Hernandez in satisfying the requirements. She said
she always notified him of hearings and appointments in letters and would enclose stamped, self-addressed envelopes so that he could communicate with her and the children more easily. She sent
him photos of the children, as well as updated information about them. Hernandez sent the children
three or four letters and drawings by way of Scalf. However, he stopped corresponding to the
children a full year before trial. After Hernandez was incarcerated, Scalf continued to maintain
contact with him at the various penal facilities where he was placed. Scalf testified that she made
reasonable efforts to work with Hernandez towards reuniting with his children. She said that
Hernandez did not show actions consistent with his expressed desire to take care of his children. 

 The trial court terminated Hernandez's parental rights. It expressly found, by clear
and convincing evidence, that the Department had established statutory termination grounds and that
termination would be in the children's best interests. See Tex. Fam. Code Ann. § 161.001(1), (2). 
This appeal followed.


DISCUSSION


 On appeal, Hernandez presents seven issues, alleging that the trial court lacked
personal jurisdiction because he had not been properly served with citation, that his due process
rights were violated because the trial court failed to issue a bench warrant and held the termination
trial in his absence, that the existence of discrepancies in the record demonstrates that his due process
rights were violated, and that there is legally and factually insufficient evidence to support the
statutory grounds for termination.


Proof of service

 In his first issue, Hernandez asserts that the trial court lacked personal jurisdiction
over him, alleging that the record contains no proof that he was properly served with citation upon
the filing of the Department's current (August 2003) petition seeking termination. Although the
record as originally forwarded to this Court apparently did not include this information, the
Department supplemented the record upon discovering the omission. See Tex. R. App. P. 34.5(c). 
The record before us contains a copy of the petition and citation issued on September 25, 2003, and
executed on Hernandez on October 10, 2003, in Pollock, Louisiana, the location of the federal prison
where he was incarcerated. The record thus demonstrated that the trial court had acquired personal
jurisdiction over Hernandez before it signed its judgment in March 2004. We overrule Hernandez's
first issue.


Bench warrant

 In his second issue, Hernandez complains that the trial court did not issue a bench
warrant to enable him to attend trial and proceeded without him being present. Hernandez does not
dispute that he never requested to be bench warranted back to Brady for trial. Rather, he attacks the
trial court's sua sponte application of the Z.L.T. factors, see 124 S.W.3d 163,165 (Tex. 2003), (3) and
determination that his presence at trial was not essential to protect his rights and that his rights could
be adequately protected by allowing him to participate by affidavit. 

 Hernandez's failure to request to be bench warranted is fatal to his complaint. In
Z.L.T., the supreme court held that trial courts do not have a duty to independently examine the
record and weigh the relevant factors when an inmate requests a bench warrant but fails to explain
why he or she is entitled to attend trial. 124 S.W.3d at 166. Instead, an inmate, like any other
litigant, has the burden to identify with sufficient specificity the grounds for the ruling he seeks. Id.
at 166 ("since a prisoner has no absolute right to be present in a civil action, it follows that the
prisoner requesting a bench warrant must justify the need for his presence"); see also Tex. R. Civ.
P. 21; Tex. R. App. P. 33.1(a)(1)(A). Here, Hernandez did even less than the inmate in Z.L.T.: he
did not make a request to the trial court that he be allowed to attend trial. (4) We overrule Hernandez's
second issue. (5) 

Sufficiency of the evidence

 In issues three through six, Hernandez challenges the sufficiency of the evidence to
support the trial court's findings that Hernandez committed acts and omissions constituting statutory
termination grounds under subsections (D), (E), (N) and (O) of family code section 161.001(1). (6) 
The court was authorized to terminate Hernandez's parental rights if the Department proved and the
court found, by clear and convincing evidence, (1) that Hernandez engaged in conduct constituting
a statutory ground for termination and (2) that termination was in the children's best interests. See
Tex. Fam. Code Ann. § 161.001 (West 2002); In re C.H., 89 S.W.3d 17, 23 (Tex. 2002). Although
the trial court found several statutory grounds for termination, the Department was required to
establish only one to satisfy the first element of the termination standard. Green v. Texas Dep't of
Protective & Regulatory Servs., 25 S.W.3d 213, 219 (Tex. App.--El Paso 2000, no pet.); In re
J.M.T., 39 S.W.3d 234, 237 (Tex. App.--Waco 1999, no pet.); In re D.G., 5 S.W.3d 769, 771 (Tex.
App.--San Antonio 1999, no pet.). Moreover, Hernandez has not challenged the trial court's finding
regarding the second element of the termination test, that termination was in the best interest of the
children. Accordingly, to affirm we need only determine that there is sufficient evidence to support
one of the termination grounds found by the trial court.


 Standard of review

 To terminate parental rights, the Department must make its required showings by
clear and convincing evidence. "Clear and convincing" evidence is that degree of proof which will
produce in the mind of the trier of fact a firm belief or conviction in the truth of the proposition
sought to be established. Tex. Fam. Code Ann. § 101.007 (West 2002). Evidence is clear and
convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth
of the allegations" supporting termination. C.H., 89 S.W.3d at 23 (quoting State v. Addington, 588
S.W.2d 569, 570 (Tex. 1979)). 

 In reviewing the legal sufficiency of the evidence under the clear and convincing
standard, we consider all of the evidence in the light most favorable to the finding and determine
whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was
true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We review the factual sufficiency of the
evidence under the clear and convincing standard by viewing all of the evidence and determining
whether a reasonable fact-finder could have resolved disputed evidence in favor of its finding. Id. 
If the disputed evidence is such that a reasonable fact-finder could have formed a firm belief as to
the truth of the Department's allegations, the evidence is factually sufficient. Id.; C.H., 89 S.W.3d
at 25. These standards of review maintain the appropriate deference to the fact-finder's role by
assuming that it resolved evidentiary conflicts in favor of its finding when it was reasonable to do
so and by disregarding evidence that it could have disbelieved. J.F.C., 96 S.W.3d at 266-67.


 Endangerment

 In issues three and four, Hernandez challenges the sufficiency of the evidence
supporting the trial court's findings that he knowingly placed or allowed his children to remain in
conditions or surroundings that endangered their well-being or knowingly allowed his children to
remain with persons who engaged in conduct that endangered his children. See Tex. Fam. Code
Ann. § 161.001(1)(D), (E). To prove endangerment under subsection D, the Department had to
prove that Hernandez (1) knowingly (2) placed or allowed the children to remain (3) in conditions
or surroundings that endangered their physical or emotional well-being. Id. § 161.001(1)(D). (7) Under
subsection E, the Department had to prove that Hernandez (1) engaged in conduct or knowingly
placed the children with persons who engaged in conduct (2) which endangered their physical or
emotional well-being. Id. § 161.001(1)(E). Under subsection D, the danger to the child results from
the child's environment, while under subsection E, the parent's conduct is the source of the danger
to the child. In re D.C., 128 S.W.3d 707, 715 (Tex. App.--Fort Worth 2004, no pet.); Robinson v.
Texas Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 686 (Tex. App.--Houston [1st Dist.]
2002, no pet.). 

 A parent's failure to maintain a home and constantly moving and changing locations
may constitute conduct that endangers a child's well-being. See In re S.G.S., 130 S.W.3d 223, 238
(Tex. App.--Beaumont 2004, no pet.). Stability and permanence are paramount in the upbringing
of children. See In re T.D.C., 91 S.W.3d 865, 873 (Tex. App.--Fort Worth 2002, pet. denied); In
re M.A.N.M., 75 S.W.3d 73, 77 (Tex. App.--San Antonio 2002, no pet.); Salas v. Texas Dep't of
Protective & Regulatory Servs., 71 S.W.3d 783, 792 (Tex. App.--El Paso 2002, no pet.); see
Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 513 (1982) (children need
stable, long-term relationships with caretakers). A fact-finder may infer from past conduct
endangering the well-being of a child that similar conduct will recur if the child is returned to the
parent. See In re D.L.N., 958 S.W.2d 934, 941 (Tex. App.--Waco 1997, no pet.). 

 Furthermore, a parent's repeated criminal acts may constitute sufficient evidence of
conduct that endangers the well-being of a child. In re J.N.R., 982 S.W.2d 137, 143 (Tex.
App.--Houston [1st Dist.] 1998, no pet.), disapproved on other grounds by C.H., 89 S.W.3d at 24-25; see also In re A.W.T., 61 S.W.3d 87, 89 (Tex. App.--Amarillo 2001, no pet.); Allred v. Harris
County Child Welfare Unit, 615 S.W.2d 803, 806 (Tex. App.--Houston [1st Dist.] 1980, writ ref'd
n.r.e.). Illegal drug use in the child's household constitutes surroundings that endanger the well-being of the child under subsection D. D.C., 128 S.W.3d at 715-16; In re S.D., 980 S.W.2d 758, 763
S.W.3d 707, 715 (Tex. App.--San Antonio 1998, pet. denied). Violent or abusive conduct by
someone within the household also constitutes an environment that endangers children. K.A.S., 131
S.W.3d 215, 222 (Tex. App.--Fort Worth 2004, pet. denied); D.C., 128 S.W.3d at 715; Director of
Dallas County Child Protective Servs. Unit v. Bowling, 833 S.W.2d 730, 733 (Tex. App.--Dallas
1992, no writ); In re B.R., 822 S.W.2d 103, 106 (Tex. App.--Tyler 1991, writ denied); Ziegler v.
Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678-79 (Tex. App.--Fort Worth 1984, writ
ref'd n.r.e.). 

 The evidence at trial, summarized above, overwhelmingly demonstrated that
Hernandez failed to provide his children with a safe and stable environment. Hernandez subjected
the children to a chaotic and virtually nomadic lifestyle. By all accounts, he had a violent temper
and routinely screamed at Silva. He was physically violent towards Silva in the presence of the
children. The children also witnessed his alcohol and drug abuse; the adverse impact on the children
was demonstrated when the four-year-old attempted to order a cold beer at the emergency shelter and
by M.H.'s statements concerning the appropriateness of alcohol use by children. Evidence in the
record also supports the claim that Hernandez engaged in sexual activity in front of the children that
had an adverse affect on their psycho-social development. Hernandez also persisted in criminal
conduct that resulted in incarcerations that prevented him from properly supervising the children;
his criminal conduct continued even after the children were removed and his parental rights were at
stake. The evidence in this case constitutes clear and convincing proof that Hernandez knowingly
placed his children in harmful circumstances and engaged in conduct that endangered their physical
and emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(D), (E). We overrule
Hernandez's third and fourth issues. (8)

Due process

 In his seventh issue, Hernandez argues that he was deprived of his rights to due
process under the Fifth and Fourteenth Amendments by what he alleges to have been the
Department's use of falsified or inaccurate documentary evidence at trial. He bases this complaint
on apparent inconsistencies between three of the Department's trial exhibits, PX1, PX2, and PX4,
and corresponding documents in the clerk's record. 

 PX1 is a certified copy of the February 2002 temporary order setting forth conditions
for Silva and Hernandez to be reunified with the children. PX1 and its counterpart in the clerk's
record differ with regard to the recitation concerning whether Hernandez attended the adversary
hearing that preceded the order. Although the clerk's record version recites that Hernandez "is
incarcerated and did not appear in person," PX1 contains handwritten alternations reflecting that
Hernandez "is incarcerated and did not appear in person." PX1 is consistent with the trial testimony
of Department caseworkers that Hernandez did, in fact, attend this hearing. 

 PX4 is a certified copy of the March order approving the family service plan. The
inconsistencies between PX4 and its counterpart in the Clerk's Record are similar to those involving
PX1: PX4 contains handwritten modifications reflecting that Hernandez "did/did not appear in
person" at a March 21, 2002 hearing, but the corresponding document in the clerk's record does not
indicate whether or not Hernandez appeared. Trial testimony reflected that, consistent with PX4,
Hernandez did not attend this hearing, although he had notice and was not incarcerated. 

 PX2 is a certified copy of the March 2002 family service plan. PX2 does not contain
Hernandez's signature, but the corresponding document in the clerk's record does contain
Hernandez's signature. 

 Hernandez's counsel did not object to the admission of any of the challenged exhibits
at trial. In order to complain on appeal about the admission of evidence, an appellant must have
made a timely objection in the trial court specifying the grounds for the objection, otherwise error
is waived. See Tex. R. Evid. 103(a)(1); Tex. R. App. P. 33.1; Bushnell v. Dean, 803 S.W.2d 711,
712 (Tex. 1991); In re C.Q.T.M., 25 S.W.3d 730, 733 (Tex. App.--Waco 2000, pet. denied). Error
in the admission of evidence cannot be raised for the first time on appeal. Tex. R. App. P. 33.1;
Bushnell, 803 S.W.2d at 712.

 Moreover, Hernandez has not demonstrated how the discrepancies in these exhibits
prejudiced him. He does not suggest that there are other inaccuracies in the documentary evidence
in this case. He argues only that the failure of the Department to "offer accurate copies" in trial or
the "failure of the clerk to maintain accurate copies of court record would seem to invoke issues of
due process and fundamental fairness in the proceeding before the court." Based on this equivocal
suggestion, he asks this Court to hold that he was denied due process. He cites no authority for his
position.

 We hold that any discrepancies were not material to the judgment and that any error
in their admission was harmless. We overrule Hernandez's seventh issue.


CONCLUSION


 Having overruled Hernandez's first, second, third, fourth, and seventh issues on
appeal, we have no need to consider his fifth or sixth issues. We affirm the decree of termination. 



 __________________________________________

 Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: March 10, 2005
1. As discussed below, the copy of the March 2002 family service plan in the Clerk's Record
is signed by Hernandez, but the copy introduced into evidence at trial and included in the Reporter's
Record is not signed by Hernandez.
2. On appeal, Hernandez suggests that it was improper for the trial court to admit testimony
recounting statements made by the children to caseworkers, therapists, and foster parents after their
removal. But these out-of-court statements were admitted without objection. See Tex. R. Evid. 802
("Inadmissible hearsay admitted without objection shall not be denied probative value merely
because it is hearsay.").
3. Although inmates cannot be denied access to the courts simply because they are
incarcerated, they do not have an absolute right to appear in person in every court proceeding. 
Rather, courts must balance an inmate's right of access to the courts against the efficacy of the
correctional system. See In re Z.L.T., 124 S.W.3d 163, 165 (Tex. 2003). A variety of factors are
considered in making this assessment, including: (1) the cost and inconvenience of transporting the
prisoner to the courtroom; (2) the security risk to the court and public posed by the inmate; (3)
whether the prisoner's claims are substantial; (4) whether resolution of the litigation can reasonably
be delayed until the inmate's release; (5) whether the inmate can and will offer admissible,
noncumulative testimony that cannot be presented by deposition, telephone, or some other means;
(6) whether the inmate's presence will facilitate judging of his or her demeanor or credibility; (7)
whether trial is to the court or a jury; and (8) the inmate's probability of success on the merits. Id.
at 165-66.
4. Moreover, Hernandez brings forward nothing that might lead us to conclude that the trial
court abused its discretion in determining that Hernandez's physical presence at trial was not
essential to protect his rights. 
5. Hernandez briefly states, in the last sentence of his argument regarding his second issue,
that the trial court "abused its discretion in denying the defendant the right to be present at trial and
by denying the motion for continuance." (Emphasis added.) This statement appears in the context
of an argument regarding the eighth element of the Z.L.T. test, potential for delay. Hernandez makes
no other mention of his motion for continuance, nor does he provide argument, legal authorities, or
record cites to support his sole assertion. Hernandez has thus waived any complaint regarding the
trial court's denial of his motion for continuance. See Tex. R. App. P. 38.1(h); Trenholm v. Radcliff,
646 S.W.2d 927, 934 (Tex. 1983).
6. Hernandez does not specify whether he is challenging the legal or factual sufficiency of the
evidence, or both. We will assume he is challenging both the legal and factual sufficiency of the
evidence. 
7. The degree of endangerment required for involuntary termination is "more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family environment," but the child
does not need to suffer actual physical injury. In re M.C., 917 S.W.2d 268, 269 (Tex. 1996); Texas
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Instead, "endanger" means to
"expose to loss or injury; to jeopardize." Boyd, 727 S.W.2d at 533. Moreover, the parent need not
have actual knowledge of an injury or certain knowledge that an injury to the child will result; it is
enough that the parent is aware of the potential danger to the child and the parent disregards the risk. 
In re S.G.S., 130 S.W.3d 223, 238 (Tex. App.--Beaumont 2004, no pet.). 
8. We have no need to address Hernandez's fifth and sixth issues, in which he attacks the trial
court's findings under subsections (N) and (O) because the evidence is sufficient to support at least
one of the termination grounds. See Robinson, 89 S.W.3d at 687; In re S.F., 32 S.W.3d 318, 320
(Tex. App.--San Antonio 2000, no pet.) (only one ground need be proved under section 161.001(1)
to support judgment of termination).