COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH


NO. 2-04-299-CV


IN THE INTEREST OF J.I., A CHILD



------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION [1]

------------

I. Introduction
        C.I. appeals the trial court’s judgment terminating her parental rights to
J.I. [2] In her first two points, C.I. challenges the legal and factual sufficiency of
the evidence to support the trial court’s finding that she had endangered J.I.
and that termination was in J.I.’s best interest. In her third point, C.I. claims
that the Texas Department of Family and Protective Services (TDFPS, also
referred to herein as CPS) violated the Americans with Disabilities Act (ADA)
by failing to accommodate her disability. We will affirm.
II. Background Facts
        A.     Incidents Prior to C.I.’s and William’s April 23, 2003 Arrest and the
Removal of J.I.
 
        1.     Escort Service
        From 1997 to 2001, C.I. used her home to run an escort service called
Sweet Seductions.
        2.     Relationship with William
        In June 2000, C.I. met William through her brother. At that time, J.I.
was almost four years old. C.I. married William six months later; William had
convictions for burglary of a habitation and burglary of a building and was on
parole when the couple married. C.I. testified that William’s parole was revoked
based on new theft charges and possession of marijuana charges.
        C.I. testified that in April 2003 she learned William was a confirmed
member of the Aryan Brotherhood gang. Although William had previously
talked about being in the Aryan Brotherhood, C.I. did not think that “he was
truly a confirmed gang member.” She claimed that she “didn’t know he [had]
. . . the FBI file and everything.” C.I. learned that William had dealt with the
Aryan Brotherhood in prison and that “[t]hey were helping him.” She admitted
that she chose to allow J.I. to remain in the same house with William even after
she knew of his gang affiliation. [3] 
        3.     Drug Possession in 2001
        In 2001, C.I. was arrested for possession of marijuana. The marijuana
was on top of her entertainment center. The drugs belonged to C.I. and
William, but C.I. said that she claimed the drugs and took the blame because
William was on parole.
        4.     CPS Referrals During 2001
        C.I. testified that she was first referred to CPS in 2001 for improperly
supervising J.I. According to C.I., a CPS investigator came and talked to her
and then the charges were dropped. In June 2001, William was accused of
domestic violence, causing physical abuse to J.I, but C.I. does not remember
what became of that charge. She also remembered a CPS referral in August
2001, concerning additional allegations of William’s physical abuse of J.I. and
allegations that J.I. had killed a cat. 
        5.     Domestic Violence and Events Surrounding Birth of A.I. in 2001 [4]
        Ms. Slack testified that C.I. and William had violent fights before A.I. was
born. They fought “like cats and dogs.” She saw William hit J.I. once, saw
bruises on C.I.’s face, and saw C.I. with a “busted lip.” Ms. Slack further
testified that police responded numerous times to domestic violence calls
involving C.I. and William. She said that on several occasions she offered to
take J.I. home with her until the situation calmed, but C.I. never accepted her
offers. 
        Ms. Slack described one particular incident that occurred while C.I. was
pregnant with A.I. Ms. Slack said that C.I. was fighting with William and told
J.I. to scream obscene things at William. C.I. put J.I. into the car to leave and
backed up so quickly that she hit a tree. The accident threw J.I. into the
floorboard of the back seat because he was not strapped into the seat. William
jumped onto the car and beat on the window. C.I.’s version of the same events
was that there was not a fight; there was “a push and a shove.” C.I. said that
she did not tell J.I. to curse. She also stated that she bumped into the tree; she
did not slam into it. She confessed that she resumed her relationship with
William very shortly after this incident because she was eight months pregnant
and felt that she needed the baby’s father. 
        Ms. Slack stated that she called CPS when A.I. was three months old
because C.I. and William “smelled like a marijuana factory” when they took A.I.
to the hospital for dehydration. She explained that she did not request CPS’s
intervention earlier because of the family violence. She testified that she was
afraid William would kill her and that William and C.I. are both pretty violent
when they are mad.
        C.I. admitted that domestic violence occurred and that William hit her.
She and William had physical altercations while the children were in the house.
C.I. said that she was afraid of William because he was a very angry, very
violent, passive-aggressive type of person. She testified that William did not
hit J.I. but that William scared J.I. with his voice. She agreed that William was
emotionally abusive to both J.I. and to her. She said that she feared William
so much that she had called 911 “probably a hundred times.” Twice she and
the children left; but she subsequently returned, putting the children back into
the same dangerous environment. CPS had services available to assist C.I. in
her efforts to leave the violent situation with William, but C.I. said she was
afraid to tell CPS about her situation because she was afraid CPS would
immediately rule her an unfit mother and take away her children. C.I. agreed,
however, that it was not good for her children to be in this abusive
environment. 
        Ms. Slack testified that after A.I. was born, C.I. and her family lived with
Ms. Slack for a period of time. One day, Ms. Slack came home and found C.I.
and William drinking, A.I. asleep, and J.I. outside playing without supervision.
Shortly thereafter, C.I. and William moved out of Ms. Slack’s house. 
        6.     Neglectful Supervision Referrals in 2002
        C.I. testified that CPS referrals occurred in September and December 
2002 for neglectful supervision. [5] CPS’s allegations of neglectful supervision
were based on accounts from neighbors who observed J.I. and A.I. wandering
unsupervised in the neighborhood and based on J.I.’s truancy from Bergen
Elementary School. The attendance clerk told CPS that J.I.’s school attendance
was poor and that truancy officials had been contacted. 
        Ms. Slack also testified that whenever she went to visit her son’s family
at their apartment, J.I. was always gone. C.I. told her that J.I. was “hanging
out” with the painters and maintenance men at the apartment complex. When
Ms. Slack questioned C.I. about her decision to allow J.I. to do this, C.I. stated,
“[W]ell, [J.I.] wants to. They like him.” Ms. Slack said that one day her
daughter went to C.I.’s apartment and found that C.I. had barricaded herself
inside the apartment and would not let J.I. enter. 
        On December 27, 2002, CPS worker Christina Enriquez tried to make
initial contact with the family. While she was walking up the family’s driveway
to the front door, Enriquez smelled a strong aroma she believed to be marijuana.
She noticed that the smell was coming from the house. After she and her
coworker identified themselves, William asked them to hold on a minute; then,
he walked into the house and locked the doors. [6] Enriquez called Arlington law
enforcement to help, and they knocked on the door. However, no one
answered, so Enriquez and her coworker gave up and left. 
        CPS subsequently mailed a letter by certified mail and by regular letter to
the family requesting that they come to CPS’s office for an interview and to
discuss the neglectful supervision allegations. C.I. contacted CPS and made an
appointment. During the interview, C.I. and William initially denied that J.I. and
A.I. were ever outside alone; later, they indicated that J.I. did play outside
alone at different hours of the day, but claimed to watch him from a window.
C.I. and William explained J.I.’s truancy, indicating that they had experienced
conflicts with J.I.’s teacher [7] and had concluded that J.I. did not need to be in
school at that time. J.I. missed forty-five days of school—approximately half
a semester—from late 2002 to early 2003. C.I. received truancy warnings for
J.I.’s absences and spoke with the superintendent. At trial, C.I. admitted that
J.I.’s school absences were her fault, and she agreed that J.I. needed to be in
school.
        C.I. told Enriquez that she had attention deficit hyperactivity disorder and
bipolar disorder. [8] William also indicated that he had a disorder. During the
interview, C.I. initially denied any drug use, but later she admitted to recently
using marijuana. Enriquez also learned that William had violated his parole on
two occasions by testing positive for marijuana. Enriquez ruled the case
“reason to believe for neglectful supervision of both J.I. and A.I.” Enriquez
completed a safety plan to reduce the risk of any further neglectful supervision
of the children, and both C.I. and William signed it. Enriquez recommended
opening up family-based services to the family, and CPS opened a case to
attempt to provide assistance to them. The case was eventually closed,
however, because CPS was unable to locate the family to follow through with
the services. According to C.I., the family did not move; they lived at the
house and waited for William to get out of Wackenhut for technical violations
of his parole. 
        7.     Incidents in Early 2003
        On January 14, 2003, neither C.I. nor William would complete a drug
test. On February 28, 2003, C.I. and William withdrew J.I. from school after
he had missed forty-seven of the eighty-three days that he was enrolled. 
        In April 2003, C.I. and her family were living in their Jeep. Ms. Slack
testified that William told her that they had been camping at Joe Pool Lake
because C.I.’s mother’s residence in Arlington was tied up in probate.
        B.     C.I.’s and William’s Arrest on April 23, 2003
        Officer Richard Jablon testified that on April 23, 2003, he responded to
a suspicious persons call, which resulted in an arrest report. Pawn shop
employees called 911 when C.I. and William arrived. The employees had been
advised by police detectives to be on the lookout for the couple because they
were suspects in residential burglaries. When Officer Jablon arrived at the
pawn shop, William was inside trying to pawn a bicycle, while C.I. and the
children waited in a Jeep outside the pawn shop. Officer Jablon noted that the
condition of the Jeep was very cluttered; lots of trash and food products filled
the Jeep’s interior. Officer Jablon ran a warrant check; William and C.I. both
had outstanding warrants. Warrants had issued for C.I.’s arrest based on
tickets for speeding, no insurance, and failure to use a seatbelt. 
        Police arrested William; a search incident to his arrest revealed marijuana
in a baggie in his pocket. William was charged with possession of marijuana
and burglary. A search of the Jeep revealed a two-inch-long marijuana cigarette
in the ashtray in the front console near C.I.’s position in the front driver’s seat. 
Consequently, Officer Jablon charged C.I. with possession of marijuana. 
Ultimately, C.I. received thirty days’ confinement for the possession charge. 
        Between the front seats, Officer Jablon located a cooler containing a pipe
used to smoke marijuana. In a towel, Officer Jablon found two glass pipes
used to smoke methamphetamine and a small wire used to push the drug
through the pipes. In the glove compartment, Officer Jablon found small pieces
of tin foil containing a burned residue, probably methamphetamine. He charged
C.I. with possession of drug paraphernalia based on the marijuana-smoking
pipe, the glass pipes, and the tin foil. Officer Jablon called CPS because, in his
opinion, the children’s presence in a vehicle containing this drug paraphernalia
endangered them. He also noted that the Jeep contained a circular saw, a tool
set, and a hatchet, which were all possibly stolen items. 
        C.I. told Ms. Slack that she (C.I.) was just as guilty of the burglaries as
William and that the children were in the Jeep during the burglaries. C.I. said
that as she was driving, William would walk down the sidewalk looking for
open garages; then, he would retrieve items and put them in the Jeep. Ms.
Slack expressed concern that C.I. was involving the kids in the burglaries. 
        C.I. testified to her version of the events of April 23, 2003. [9] On that
day, she was in her Jeep with her two children waiting for William to pawn an
item. She claimed that she did not know at the time that William had been
involved in several burglaries. She just knew that William had violated his
parole by not showing up to see his parole officer. She stated that Ms. Slack’s
testimony that C.I. admitted to participating in the burglaries was incorrect. 
She also said that she did not know until she visited with William that he had
placed marijuana between the ashtray and the dash, and when she spoke with
her case worker, she denied having marijuana in the car with her. She said that
she pleaded guilty to possession of marijuana because she thought that she
was guilty based on the fact that she owned the Jeep. C.I. admitted that a bag
with drug paraphernalia was hidden in the back of the Jeep. When asked why
it was there, C.I. admitted, “We had a drug problem.” C.I. agreed that both
children were put in a dangerous situation by being placed inside a vehicle
where marijuana and methamphetamine use occurred. 
        When asked where she was living on the day of the arrest, C.I. said that
she had inherited her mother’s home, which had black mold, and that they were
living there. She said that she did not want anybody to know too much
because Ms. Slack constantly called CPS and sent them to her house. 
        C.     Removal of Children
        When C.I. and William were arrested, they were not able to provide law
enforcement or CPS with the names of relatives or friends for placement of the
children. Because she was familiar with the family, Enriquez was assigned the
April 23, 2003 CPS referral by Officer Jablon. The children had nowhere to go,
so CPS completed an emergency removal. CPS conducted an abbreviated
home study on Ms. Slack and received court approval for temporary placement
of both children in her home. [10] Enriquez ruled the case “reason to believe for
neglectful supervision.” 
        Shortly after C.I. and William were arrested, Ms. Slack went to get A.I.’s
carseat out of the Jeep, which had been impounded. Ms. Slack left the carseat
in the Jeep because it was filthy. She found clothes in the Jeep that were
soiled with urine or feces and noticed that the vehicle had lots of fast food
wrappers and papers scattered throughout. Ms. Slack also went to C.I.’s house
in Arlington to retrieve the children’s Medicaid cards. The house did not have
electricity, lawnmowers had been placed inside the house, and a dog “in bad
shape” was in the back yard.
        D.     Post-Arrest and Post-Removal Incidents in 2003 and 2004
        1.     J.I.’s Interview and Foster Placement
        On April 29, 2003, Enriquez interviewed J.I., who was under age twelve. 
J.I. stated that his parents used marijuana and described an incident when C.I.
unknowingly handed him a joint because she thought J.I. was William. J.I.
explained that “friends” would come to his home and give William drugs, and
William would pay for them.
        In June 2003, Ms. Slack asked CPS to remove J.I. due to his erratic
behavior. Ms. Slack said that she was afraid that J.I. was going to injure his
sister or burn down her house. She left a message with CPS that living with
J.I. was like having a wild animal in her house. CPS accommodated Ms. Slack
by removing J.I. and placing him in a therapeutic foster home. 
        2.     C.I.’s Efforts at Drug Rehabilitation and Employment
        In July 2003, C.I. completed thirty days in a drug treatment program at
Pine Street. After C.I. completed rehabilitation, she called Ms. Slack because
C.I. was about to be evicted from her apartment and needed a new tire for her
vehicle. Ms. Slack offered C.I. a mobile home where she could live until she
could get on her feet and get a job. Ms. Slack also took C.I. to interviews and
bought her clothes. Ms. Slack testified that C.I. went to work at a couple of
different places but only for a day or two; she said that C.I. had approximately
four jobs in a month and a half. C.I. blamed her loss of jobs on Ms. Slack. She
said that Ms. Slack had called her employers and told them that CPS had
removed her children and that C.I. had a criminal history. She admitted that
Ms. Slack paid her bills for three to four months. 
        Ms. Slack testified that C.I. told her in approximately August of 2003 that
she had “fallen off the wagon” and had been smoking marijuana with her next-door neighbor. 
        In September 2003, Christy Wright began handling J.I.’s case. At that
time, the service plan for C.I. included attending MHMR, attending parenting
classes, completing a drug assessment, completing drug treatment, giving
random UA’s, obtaining housing, and obtaining and maintaining a job. In
October 2003, C.I. admitted to Wright that she had used marijuana twice in the
past week, but C.I. managed to pass her UA. C.I. testified that she felt very
guilty in October 2003 for taking two hits off a joint because she had been
clean for six months, so she told her caseworker and Ms. Slack because she
needed and wanted help. She admitted that her use in October occurred after
she had already completed the detoxification program at Pine Street.
        3.     Arrests in 2003
        On November 11, 2003, police arrested C.I. for failing to pay her
restitution. She paid for some unpaid tickets and made bond the same day. On
November 20, 2003, police arrested C.I. for theft and driving while her license
was suspended. C.I. stated that on that date she was on two different mood
stabilizers and that she should have been on just one because the two mixed
together were dangerous. She admitted that she was not in her right mind
when she was arrested. She explained that she had over four hundred dollars
in her pocket without knowing why and that she went to the store and opened
a package of meat. She said that she left the opened package at the store but
that she was arrested for attempting to steal meat. She said that she bonded
out of jail after two days. The court placed C.I. on probation for both offenses.
In December 2003, CPS created a new service plan for C.I., reiterating the
same things as the first plan. 
 
        4.     Change in Service Plan
        CPS changed its plan to termination in January 2004. In February 2004,
CPS changed C.I.’s service plan to require her to attend Narcotics Anonymous
meetings, to obtain the name of her sponsor and give it to her case worker, to
complete a drug assessment through CATS, to comply fully with their
recommendations, to participate in a psychological evaluation, and to address
her mental health issues with MHMR. The new plan also required C.I. to
demonstrate the skills she had learned about in her services, to demonstrate
that she is a responsible parent, and to attend and participate in parenting
classes.
        5.     Psychological Evaluation
        On March 16, 2004, Dr. Cathy DeOrnellas conducted a psychological
evaluation on C.I. She noted that C.I. had significant difficulty completing the
intake paperwork; although the paperwork normally takes fifteen minutes for
a patient to complete, Dr. DeOrnellas had to spend two hours going over the
paperwork with C.I. because she was concerned that the information might be
used against her in some way. Throughout the testing, C.I. needed a lot of
reassurance that she was doing well. 
        The testing revealed that C.I.’s IQ is in the average range and that she
does not have any major emotional or personality problems. The areas of
concern were that C.I. has variable moods that tend to be elevated at times
beyond what is considered normal and that she tends to be suspicious regarding
other people’s motives. Additionally, she had minimal symptoms of depression;
she tended to be nervous; she had a borderline antisocial feature, meaning that
she had a hard time interacting with people; and she reported zero problems
with parenting in an attempt to make herself look better than she was. Dr.
DeOrnellas noted that C.I. had an unusual relationship with J.I.—she treated
him as an equal rather than as a child. Dr. DeOrnellas said that C.I. was not
very interested in treatment because she felt like she did not have a problem.
Dr. DeOrnellas recommended that C.I. stay in counseling, continue visitation
with her children as CPS allowed, attend parenting classes, and be monitored
for drug and alcohol abuse. [11] She concluded that it was possible for C.I. to
have trouble completing the service plan because C.I. lacked a support system,
had problems making decisions, was depressed, and took almost a year to get
her psychological evaluation.
        6.     Possession of Cocaine
        Police arrested C.I. in April 2004 for felony possession of cocaine. C.I.
asked Ms. Slack to bail her out and admitted to using cocaine. C.I. said that she
did not mention trying cocaine to Ms. Slack and that she never asked her to bail
her out of jail. C.I. said that she was not using cocaine in April 2004; she was
selling it for money to move back to Granbury. C.I. told her case worker that
she did not know how the cocaine got into her suitcase. She admitted that she
pleaded guilty to possession of cocaine and was on three years’ probation.
        7.     Compliance with Probation Conditions
        Jennifer Davis, C.I.’s adult probation officer with Hood County, testified
that she was assigned C.I.’s case after C.I. was placed on probation for driving
while her license was suspended and for theft. The original term of C.I.’s
probation was six months, and C.I. was to pay fines, court costs, and
restitution. Ms. Davis stated that C.I. had kept current with her reporting and
her fees and that all five of C.I.’s drug tests had been clean. Ms. Davis stated
that up until April 2004, C.I. had done well as a probationer.
        Because C.I. committed the offense of possession of cocaine in Bosque
County in April 2004, she was required to attend STAR counseling for drug
treatment and to complete twenty days in jail on the weekends. C.I.
successfully completed the STAR program.
        8.     Anger Management
        Christie Guion, the CASA volunteer assigned to this case, testified that
once when Ms. Slack brought the children to a visit C.I. became very upset and
started yelling at Ms. Slack. Ms. Guion said that J.I. was frightened. Ms.
Guion also witnessed C.I. get upset in the courtroom one time.
        Wright testified that she had also seen anger management issues in C.I.
At the mediation on March 5, 2004, C.I. became very angry when she heard
that the therapist was recommending that J.I.’s visits be reduced to every other
week for two hours. C.I. stated that she wanted more time with J.I. and that
she wanted another opinion from a different professional.
        At the June 2, 2004 status review, C.I. accused Wright of changing the
service plan by constantly adding services and told Wright that she wanted a
new caseworker. C.I. said that she and Wright had irreconcilable differences,
she wanted a new CASA volunteer because hers was biased, and she yelled at
the judge that “yes, she was in anger management.” C.I. began anger
management classes in June, but she had not completed them at the time of
the termination hearing.
        Ms. Slack also testified regarding C.I.’s anger. She stated that C.I. still
had problems controlling her anger and that she blew up when she was served
with papers regarding a court date on A.I.’s conservatorship. Because of C.I.’s
behavior during several of the visits with A.I., Richard Davis was hired to
supervise the visits. On July 13 and 14, 2004, Davis noticed a change in C.I.’s
behavior that caused him concern. C.I. wanted Davis to write a report; he said
that if he did write a report, it would just include the facts of the visitation. At
that point, C.I. fired him and said that she was going to sue him for slander.
C.I. did all of this in front of A.I. at a public park. Thereafter, Davis
recommended that the visits between C.I. and A.I. be conducted in restricted
settings and be videotaped and audiotaped, that random drug screenings be
conducted based on C.I.’s erratic behavior and the pending charges against C.I.
for possession with intent to sell, and that C.I. be required to consult with a
licensed mental health counselor regarding her visitation because of her
outbursts and comments that people tell lies about her. When the visits were
moved to McDonald’s, C.I. acted appropriately.
        C.I. agreed that there were times when she had uncontrolled anger
outbursts, but she said that some of the incidents were blown out of proportion
because sometimes she was just expressing her opinion or talking loudly. C.I.
denied that she had an anger outburst in Granbury relating to visitation with A.I.9.C.I.’s Visitation with Children
        Guion testified that J.I. seemed glad to see his mother during visits, but
he did not seem particularly bonded to A.I. Guion observed J.I. being a parent
to A.I. and initiating activities with his mom because she did not ask him about
school, sports, church, or his friends while Guion was present. Instead, C.I.
just read her parenting class notes to J.I. and told him the twelve-step process
from Narcotics Anonymous. She yelled at J.I. when he became disinterested. 
During one visit, C.I. talked to J.I. about the case. The CPS worker terminated
the visit because C.I. had been warned not to talk to J.I. about his biological
father. 
        10.   C.I.’s Compliance with CPS Plans
        Wright testified that throughout the course of the case C.I. exhibited
angry outbursts, including yelling in the courtroom, slamming down the phone
in Wright’s ear, yelling at Wright, cursing at Wright, and becoming very angry
after a visit. Wright confirmed that C.I. still has mood swings and that
sometimes C.I. is off her bipolar medications. 
        CPS paid for C.I. to attend parenting classes in Granbury, and she
successfully completed those classes in March 2004. However, Wright
testified that C.I. is not displaying the skills she learned from her parenting
classes and is still not exhibiting appropriate parenting skills. 
        C.I. waited almost four months to get her drug assessment. [12] Wright
testified that because of how late in the process the assessment was done, it
limited her ability to come up with appropriate services for C.I. Wright stated
that the late drug assessment left little time to see if C.I. internalized anything
from the drug rehabilitation sessions and was done too late to help C.I. get in
a position to get J.I. back. Despite the lateness of the assessment, C.I.’s
urinalysis tests never tested positive for marijuana or cocaine. 
        One thing that deeply concerned Wright was C.I.’s inability to refrain from
committing criminal acts, as evidenced by her April 2004 arrest for possession
of a controlled substance. The Child Advocate Report that was filed shortly
after the hearing stated that there are two criminal cases pending against C.I.
        11.   C.I.’s Current Status
        C.I. lives in a house that she is buying from Ms. Slack. She is current on
her house payments and also pays insurance and taxes. She receives Social
Security Disability Income for her bipolar disorder in the amount of $600 a
month and has several thousand dollars in inheritance money. [13] She does
home health, but she did not have proof of employment because she did not
have a driver’s license at the time of the hearing; she stated that she would get
her driver’s license back in September. [14] She stated that she sees three
counselors a week at MHMR. She stated that she loves her anger management
counselor and is going to take some additional classes on grieving. 
        She made a decision at mediation in March or April 2004 to allow A.I. to
be placed with Ms. Slack. She knew that she could not handle both kids. She
was going to deal with her issues so that she could get J.I. back. However,
she admitted that one month after giving up A.I., she decided to sell cocaine
because she was very depressed.
        12.   J.I.’s Status
        Ms. Slack testified that when J.I. moved in with her, she noticed fairly
quickly that he had behavioral problems. She said that he was naturally angry,
began to hurt his sister and bruise her, injured Ms. Slack’s dog and Ms. Slack’s
daughter’s dog, set fire to his bedroom, and dirtied his underwear. [15] 
        J.I.’s counselor testified that the major concerns when J.I. first started
counseling were daily encopretic episodes, physical aggression, and difficulty
with structure and rules. She testified that children with encopresis have
suffered some sort of abuse in the past or some sort of serious stress and have
difficulty expressing their feelings because they do not feel safe in their
surroundings. She said that living in his mother’s home “had to have been a
contributing, major contributing, factor for his behavior when he arrived.” J.I.
talked to his counselor about having a video tape thrown at him, the yelling and
screaming that went on in his house, and the lack of a consistent place to live
when he was with his mother. After several months in foster care, J.I. stopped
his encopretic behavior.
        Around the time of the visits with his mother, J.I.’s behavior tended to
deteriorate; he had nervous tics, difficulty controlling himself at home and at
school, more trouble complying with rules, hyperactive behavior, and non-responsive defiance. It took J.I. a couple of days after each visit with his mom
to “get back on a more even keel.” After the frequency of the visits were
reduced to every other week, J.I. had a shorter recovery period. During the
initial visits, J.I.’s counselor noted that J.I. acted in “pseudo-maturity,” wanting
to make the rules and act in an adult role. Now, he demonstrates more age-appropriate behavior.
        According to J.I.’s counselor, now J.I. is a much better behaved child
who only has occasional behavioral problems relating to competitiveness and
problem-solving. Guion testified that J.I. has transformed in a year; he went
from being insecure, having encopresis, and missing lots of school to making
friends and taking school seriously. Ms. Slack also testified that J.I. has
improved in his behavior since being placed in foster care; he has come out of
his shell, is happy, caring, talkative, and loving towards his sister. She said
that she will do what she can to make sure that A.I. and J.I. continue their
relationship as siblings.
        J.I. is one grade behind in school because he missed most of
kindergarten. He fits in with other kids and is involved in a church group, Boy
Scouts, and soccer.
III. Sufficiency of the Evidence
        In her first point, C.I. argues that there was no evidence or insufficient
evidence to support the trial court’s finding that she had in any way endangered
J.I. Specifically, C.I. contends that the evidence presented by the State to
prove the grounds for termination was legally and factually insufficient to
sustain a termination by clear and convincing evidence. TDFPS argues that
there is ample evidence to support the trial court’s findings. 
        A.     Standard of Review
        The Texas Supreme Court recently clarified the appellate standards of
review to be applied to legal and factual sufficiency of the evidence challenges
in light of the clear and convincing evidence burden of proof in termination
proceedings. In re J.F.C., 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing
legal sufficiency review); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002) (discussing
factual sufficiency review); In re J.T.G., 121 S.W.3d 117, 124 (Tex.
App.—Fort Worth 2003, no pet.). Because termination findings must be based
upon clear and convincing evidence, not simply a preponderance of the
evidence, the supreme court has held that the traditional legal and factual
standards of review are inadequate. J.F.C., 96 S.W.3d at 265; C.H., 89
S.W.3d at 25; J.T.G., 121 S.W.3d at 124. Instead, both legal and factual
sufficiency reviews in termination cases must take into consideration whether
the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the matter on which the State bears the burden
of proof. J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25; J.T.G., 121
S.W.3d at 124. With respect to a legal sufficiency point, we “look at all the
evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
finding was true.” J.F.C., 96 S.W.3d at 266; J.T.G., 121 S.W.3d at 124-25. 
In determining a factual sufficiency point, we must give due consideration to
evidence that the fact finder could reasonably have found to be clear and
convincing and then determine whether, based on the entire record, a fact
finder could reasonably form a firm conviction or belief that the parent violated
one of the provisions of section 161.001 and that the termination of his or her
parental rights would be in the child’s best interest. Tex. Fam. Code Ann. §
161.001 (Vernon 2002); C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d at 125.B.Law on Endangerment
        In proceedings to terminate the parent-child relationship brought under
section 161.001 of the family code, the petitioner must establish one or more
of the acts or omissions enumerated under subdivision (1) of the statute and
must also prove that termination is in the best interest of the child. Tex. Fam.
Code Ann. § 161.001(1); Richardson v. Green, 677 S.W.2d 497, 499 (Tex.
1984). Both elements must be established; termination may not be based
solely on the best interest of the child as determined by the trier of fact. Tex.
Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
        Endangerment means to expose to loss or injury, to jeopardize. Boyd,
727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125; see also In re M.C., 917
S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection D,
TDFPS had to prove that C.I. (1) knowingly (2) placed or allowed J.I. to remain
(3) in conditions or surroundings that endangered his physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(D). Under section 161.001(1)(E),
the relevant inquiry is whether evidence exists that the endangerment of the
child’s physical well-being was the direct result of the parent’s conduct,
including acts, omissions, or failures to act. J.T.G., 121 S.W.3d at 125. 
Additionally, termination under section 161.001(1)(E) must be based on more
than a single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E);
J.T.G., 121 S.W.3d at 125. However, it is not necessary that the parent’s
conduct be directed at the child or that the child actually suffer injury. Boyd,
727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125. The specific danger to the
child’s well-being may be inferred from parental misconduct standing alone. 
Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort
Worth 2004, pet. denied).
        A parent’s failure to maintain a home may constitute conduct that
endangers a child’s well-being. See In re S.G.S., 130 S.W.3d 223, 238 (Tex.
App.—Beaumont 2004, no pet.). Stability and permanence are paramount in
the upbringing of children. See In re T.D.C., 91 S.W.3d 865, 873 (Tex.
App.—Fort Worth 2002, pet. denied). A fact-finder may infer from past
conduct endangering the well-being of a child that similar conduct will recur if
the child is returned to the parent. See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.—Waco 1997, pet. denied), disapproved on other grounds by J.F.C.,
96 S.W.3d 256, and C.H., 89 S.W.3d 17.
        Moreover, a parent’s repeated criminal acts may constitute sufficient
evidence of conduct that endangers the well-being of a child. In re J.N.R., 982
S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.), disapproved
on other grounds by C.H., 89 S.W.3d 17. Illegal drug use in the child’s
household constitutes surroundings that endanger the well-being of the child
under subsection D. In re D.C., 128 S.W.3d 707, 715-16 (Tex. App.—Fort
Worth 2004, no pet.). Violent or abusive conduct by someone within the
household also constitutes an environment that endangers children. In re
K.A.S., 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).
Further, a parent’s mental state may be considered in determining whether a
child is endangered if that mental state allows the parent to engage in conduct
that jeopardizes the physical or emotional well-being of the child. R.W., 129
S.W.3d at 739.
        C.     Application of Law to Facts
        The evidence at trial, summarized above, demonstrated that C.I. failed to
provide J.I. with a safe and stable environment. C.I. subjected J.I. to a
oftentimes chaotic and nomadic lifestyle. She had a violent temper and
routinely screamed at others in J.I.’s presence. She was physically violent with
William in J.I.’s presence and had to call the police many times to intervene in
their bouts of domestic violence. 
        C.I. also persisted in criminal conduct that resulted in incarcerations that
prevented her from parenting J.I.; her criminal conduct continued even after her
children had been removed and her parental rights were at stake. J.I.
witnessed William burglarize houses because C.I. and William allowed the
children to ride in the car during their criminal activities. J.I. also witnessed
C.I.’s drug abuse and William’s drug purchases and was mistakenly handed a
joint by C.I. on one occasion. C.I. chose to take illegal drugs instead of her
bipolar medications, which resulted in abnormal mood swings. C.I. failed to
demonstrate appropriate parenting skills as reflected by several CPS referrals
for neglectful supervision, the escort service she ran from her home, J.I.’s
numerous absences from school, and her continuous relapses into drugs and
anger outbursts after taking classes to redress her drug addiction and anger
management problems. 
        We have carefully reviewed the entire record. Looking at all the evidence
in the light most favorable to the jury’s finding, giving due consideration to
evidence that the fact finder could have found to be clear and convincing, we
hold that a reasonable trier of fact could have formed a firm belief or conviction
that C.I. knowingly placed J.I. in harmful circumstances and engaged in
conduct that endangered his physical or emotional well-being. See R.W., 129
S.W.3d at 743-44; J.T.G., 121 S.W.3d at 127; see also D.C., 128 S.W.3d at
715. We overrule C.I.’s first point.
 
 
IV. Best Interest of the Child
        In her second point, C.I. argues that there was no evidence or insufficient
evidence to support the trial court’s finding that termination was in J.I.’s best
interest. Specifically, C.I. argues that the State chose to terminate her rights
as to J.I. but not as to A.I., causing the separation of siblings who were
bonded, [16] and that the State failed to present evidence of the suitability of the
foster family to raise J.I.
        A strong presumption exists that the best interest of a child is served by
keeping custody in the natural parent. In re W.E.C., 110 S.W.3d 231, 240
(Tex. App.—Fort Worth 2003, no pet.). The fact finder may consider a number
of factors in determining the best interest of the child, including the following:
the desires of the child, the present and future physical and emotional needs of
the child, the present and future emotional and physical danger to the child, the
parental abilities of the person(s) seeking custody, programs available to assist
those persons in promoting the child’s best interest, plans for the child by those
individuals or by the agency seeking custody, the acts or omissions of the
parent that may indicate that the existing parent-child relationship is not
appropriate, and any excuse for the acts or omissions of the parent. Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976); W.E.C., 110 S.W.3d at 240.        “Best interest” does not require proof of any unique set of factors, nor
does it limit proof to any specific factors. Holley, 544 S.W.2d at 371-72;
W.E.C., 110 S.W.3d at 240. Quite often, the best interest of the child is
infused with the statutory offensive behavior. W.E.C., 110 S.W.3d at 240. 
While there are instances where the offending behavior will demand termination
of parental rights, there are also those cases where the best interest
determination must have a firm basis in facts standing apart from the offending
behavior. Id. Although such behavior may reasonably suggest that a child
would be better off with a new family, the best interest standard does not
permit termination merely because a child might be better off living elsewhere.
Id. Termination should not be used to merely reallocate children to better and
more prosperous parents. Id.
        J.I. did not testify at trial. J.I.’s counselor testified that he has started
to bond with his foster parents and that he is ready to have closure. J.I.’s
CASA volunteer testified that he respects, obeys, and seems concerned about
his foster parents and is thriving in their very structured home. She
recommended permanently removing J.I. from C.I. and allowing his foster
parents to adopt him. Wright, the CPS caseworker, also testified that she
would like to make J.I.’s placement in his current foster home a permanent
situation because it has the ability to provide him with a long-term safe,
nurturing placement.
        Dr. DeOrnellas interviewed J.I. and concluded that he was at risk for
attention problems; unusual or immature behavior, social skills, and leadership
skills; and developing a conduct disorder. Her recommendations for J.I. were
to allow him to be a little boy, to prevent him from listening to adults’
conversations, to have him attend counseling and play therapy, and to limit his
exposure to television and video games. The record revealed that J.I. requires
a structured, stable, stimulating environment with consistent rules and nurturing
in order to thrive. J.I.’s counselor testified that J.I. has overcome many of his
behavioral problems because he has been in a stable, consistent, nurturing, age-appropriate environment where he has not had to be concerned with food,
water, and shelter.
        The endangering course of conduct discussion above addressed the
present and future physical and emotional dangers to J.I., as well as C.I.’s
difficulties parenting. C.I.’s violent behavior—resulting from her abuse of drugs
and her failure to properly take her bipolar medications—led to citations for
theft and possession of marijuana, drug paraphernalia, and cocaine and to time
in jail. Moreover, C.I.’s continued relationship with William also placed J.I. at
risk for harm. Therefore, TDFPS’s plan for J.I. was to terminate C.I.’s parental
rights and place him for adoption with his foster parents, [17] which would
provide the stability lacking under the status quo.
        With regard to the parental abilities of the foster parents, J.I.’s foster dad
testified that both he and his wife are home when J.I. gets home from school
and that his wife does not work. Since J.I. has been living with his family, they
have never had to meet with the school regarding J.I.’s behavior. He
mentioned that J.I. plays soccer, travels to see family, is involved in Rural
Rangers at church, and goes to camp during the summer. He said that J.I.
wants to play trombone, like their daughter. Guion said that J.I. and his foster
dad enjoy riding bikes together and camping. Wright testified that J.I.’s foster
parents have talked about how they might be able to put J.I. through college.
        The record does not reveal what programs are available to assist J.I.’s
foster parents. However, the record demonstrates that the foster parents’
therapeutic home seems to be addressing J.I.’s physical and emotional needs.        The record as outlined above, provides evidence of numerous acts or
omissions of C.I. indicating that the existing parent-child relationship is not in
J.I.’s best interests. Giving due consideration to evidence that the fact finder
could have found to be clear and convincing, and based on our review of the
entire record, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that the termination of C.I.’s parental rights would be in
J.I.’s best interest. See W.E.C., 110 S.W.3d at 247. Accordingly, we hold
that the evidence is factually sufficient to support the jury’s best interest
finding. We overrule C.I.’s second point.
V. Alleged Failure to Accommodate C.I.’s Disability
        In her third point, C.I. argues that TDFPS violated the ADA by failing to
reasonably accommodate her disability during the administration of the
reunification services. TDFPS responds that C.I.’s complaint was not preserved
for appellate review because she failed to properly plead and prove this
affirmative defense in the trial court.
        We agree with TDFPS that C.I.’s ADA complaint is in the nature of an
affirmative defense that must be pleaded to avoid waiver. See In re B.L.M.,
114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.). But see S.G.S.,
130 S.W.3d at 230 (declining to create affirmative defense out of
noncompliance with ADA). A defendant relying on an affirmative defense must
plead, prove, and secure findings sustaining the defense. B.L.M., 114 S.W.3d
at 649 (citing Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex.
1988)).
        Here, C.I. filed a general denial. C.I. failed to plead or prove her
contention that TDFPS violated the ADA by failing to accommodate her mental
deficiencies associated with bipolar disorder. Accordingly, C.I. waived her ADA
complaint. See id. Moreover, although C.I. questioned several witnesses at
trial in an attempt to show how TDFPS failed to accommodate her, the record
demonstrates that TDFPS took into account C.I.’s mental disorder and took
steps to accommodate her, which C.I. rejected. Thus, we overrule C.I.’s third
point.
VI. Conclusion
        Having overruled each of C.I.’s points, we affirm the trial court’s
judgment.


                                                          SUE WALKER
                                                          JUSTICE

PANEL B:   DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: May 5, 2005

 
NOTES
1. See Tex. R. App. P. 47.4.
2. J.I. was born on September 14, 1996. He is C.I.’s son, and his alleged
biological father is Michael Breelan. Breelan did not participate in these
proceedings and has filled out documentation giving up his rights to J.I.
3. At trial, William’s mother, J. Slack, testified that William’s parole was
revoked and that he is currently in a maximum security prison serving a ten-year
sentence on a Tarrant County charge and an eight-year sentence on a Hood
County charge.
4. A.I. was born on August 17, 2001 and is the daughter of C.I. and William;
Ms. Slack is A.I.’s biological grandmother. Ms. Slack has permanent managing
conservatorship of A.I., which C.I. does not challenge on appeal.
5. At the time, J.I. was six and in kindergarten or first grade. 
6. C.I. testified that she was in Irving with her mother’s probate attorney on this
date. 
7. The problems were that one teacher would not let J.I. wear shoes with laces
and that teachers expressed concerns about J.I.’s hearing. 
8. After C.I.’s mother died in January 2002, she testified that she began using
marijuana and methamphetamine instead of her bipolar medications.
9. She said that on the day of the arrest she had contacted the Women’s Center
and was planning to leave William. She was trying to figure out how to get
away, and William wanted to stop at a pawn shop. 
10. C.I. testified that when her kids were taken away from her, she did not
realize the serious nature of her conduct at first because she was in shock. She
stated, “I really didn’t know what was going on at the time, but after a while,
I got the point.”
11. C.I. admitted to Dr. DeOrnellas that she was addicted to methamphetamine.
12. As of the time of trial, C.I. had not received a drug assessment at CATS
because she was allowed to do STARS in place of CATS.
13. With regard to her care for J.I., C.I. testified that she gave him $1,000 in
cash from November 2003 to February 2004.
14. CPS removed the requirement that C.I. maintain stable employment because
she is drawing Social Security due to her bipolar disorder. C.I. continued to be
in and out of jobs even after saying that she could not work.
15. This behavior is known as encopresis.
16. The record is not clear on the level of bonding between J.I. and A.I.; the
CASA volunteer testified that J.I. did not seem particularly bonded to A.I.,
while Ms. Slack testified that J.I. was loving towards his sister. Whatever the
level of bonding, Ms. Slack testified that she would do her best to make sure
that J.I. and A.I. continued their relationship.
17. Although J.I.’s current foster parents had not made a decision as of the
termination hearing regarding whether they wanted to proceed with adopting
J.I., they were leaning towards adoption.